```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                              EASTERN DIVISION

 3   CAPITAL FUNDING, LLC, a             )
     Maryland limited liability          )
 4   company,                            )
                                         )    Docket No. 24 C 888
 5                     Plaintiff,        )
                                         )    Chicago, Illinois
 6         v.                            )    February 5, 2024
                                         )    9:32 a.m.
 7   BATAVIA, LLC, et al.,               )
                                         )
 8                     Defendants.       )

 9    TRANSCRIPT OF PROCEEDINGS - Plaintiff's Emergency Motion for
                 Appointment of Receiver - Volume 1
10            BEFORE THE HONORABLE THOMAS M. DURKIN

11

     APPEARANCES:
12

13   For the Plaintiff:     MS. PAIGE B. TINKHAM
                            MR. KENNETH J. OTTAVIANO
                            Blank Rome LLP
14                          444 West Lake Street, Suite 1650
                            Chicago, Illinois 60606
15

16   For the Defendants:    MR. SCOTT AHMAD
                            Winston & Strawn LLP
17                          35 West Wacker Drive
                            Chicago, Illinois 60601-9703
18

19

20

21

22   Court Reporter:        ELIA E. CARRIÓN, CSR, RPR, CRR, CRC
                            Official Court Reporter
23                          United States District Court
                            219 South Dearborn Street, Room 1432
24                          Chicago, Illinois 60604
                            312.408.7782
25                          Elia_Carrion@ilnd.uscourts.gov
```

1    (Proceedings heard telephonically.)

2         THE COURT:  Emily, please call the case.

3         THE CLERK:  All right.  This is Case No. 24 CV 888,

4    Capital Funding, LLC v. Batavia, LLC.

5         May I please ask that the attorney present on behalf

6    of the plaintiff state their name.

7         MR. OTTAVIANO:  Good morning, Your Honor.

8    Kenneth Ottaviano on behalf of the plaintiffs.  And with me

9    today is Ms. Paige Tinkham from Blank Rome; and also on the

10   line, I believe we have Jen Loucks from Capital Funding Group;

11   Mr. Michael Flanagan, the proposed receiver; and Mr. Anthony

12   Hope from Breslin, Young & Slaughter, our consultant.

13        THE COURT:  All right.

14        MR. AHMAD:  Good morning, Your Honor --

15        THE CLERK:  And on --

16        MR. AHMAD:  Oh, sorry; go ahead.

17        THE CLERK:  Oh, I said, and on behalf of any

18   defendant, please.

19        MR. AHMAD:  Yes.  Good morning, Your Honor.  This is

20   Scott Ahmad from Winston & Strawn.  I'm going to be appearing

21   on behalf of the defendant entities.

22        THE COURT:  All right.  Mr. Ahmad, my first question

23   is:  Do you object to the emergency motion for appointment of

24   a receiver?

25        MR. AHMAD:  Yes, we do, Your Honor.

1    THE COURT:  All right.  What's the basis of it,

2 understanding that Judge Johnston appointed Mr. Flanagan in a

3 very similar, if not companion, case a few days ago?

4    MR. AHMAD:  Yeah, sure.  So the -- the basis for the

5 objections are as follows, Your Honor.  As you read in the

6 emergency motion that was filed by the plaintiffs, the -- the

7 principal, if not primary, basis for the appointment of the

8 discovery at that time -- and as a matter of fact, it's the

9 first order of business that Judge Johnston followed up on

10 last Friday when we had a status conference before him was the

11 lack of insurance over the entities.  And that issue has now

12 been resolved.

13    And in particular, we got an insurance policy in

14 place from -- from Lloyd's -- Lloyd's of London.  The client

15 just actually faxed me over the certificate, and I'm still

16 awaiting some of the schedules.  But, again, that was the

17 primary basis for Judge Johnston's appointment of a receiver.

18 So -- and as -- as I understand it from -- from the client now

19 and actually have the certificate, that issue has now been

20 remedied.

21    A few other things I think that I would just mention

22 in the -- in the category of -- of -- of objections would

23 be -- would be three things -- or two or three things.  Over

24 the past week, the -- the receiver that was appointed,

25 Mr. Flanagan, who's on the line -- and I don't know if you

1    want to put these in the category of growing -- growing pains

2    of a receivership about -- or issues just in general, but

3    it -- it's caused a lot of discord among the properties over

4    which there is a receiver for, you know, in terms of scared

5    employees, patients, vendors, a lot of disruption and discord

6    when there is, in fact, an almost certain bankruptcy filing

7    forthcoming.

8           And so, you know, one of the concerns that I raised

9    at the hearing before Judge Johnston -- and even

10    Judge Johnston mentioned on Friday that -- lamenting a little

11    bit that he probably didn't think completely through that.

12    And I say that with a lot of respect, obviously.  You know --

13    you know, it's best to kind of have the company overall, you

14    know, manage those communications because, you know, what's

15    happening in these homes right now is that the, you know,

16    receiver or agents of the receiver, et cetera, telephoned, you

17    know, whatever you want to, you know, call those, telephone

18    games or whatever, you know, the -- the employees are hearing,

19    you know, bankruptcy, and it's not being contextualized

20    proper -- properly because the filing is going to be a --

21           THE COURT:  Slow down.

22           MR. AHMAD:  -- Chapter 11 reorg --

23           THE COURT:  Slow down --

24           MR. AHMAD:  Yeah.

25           THE COURT:  If you could slow down just a little bit.

1    Go ahead.

2           MR. AHMAD:  Sure.  My apologies.

3           The -- the filing is going to be a Chapter 11 reorg

4    and not a Chapter 7 liquidation, right, and so, you know, the,

5    you know, the optimism or the hope, right, is that these,

6    you know, entities are going to continue to operate and come

7    out of this, right?  And so, you know, we're trying to -- to

8    minimize the, you know, the -- the, you know, the harm to,

9    you know, patients, employees, and vendors, you know, at kind

10   of this -- at kind of this critical juncture.

11          And then the -- the other two points that I would --

12   that I would make, Your Honor, are -- you know, the -- there

13   is a cost to -- to appointing a receiver, right?  And, you

14   know, when -- when we were before Judge Johnston, everybody

15   was, like, oh, well, you know, the receiver is just gonna,

16   you know, bill his fees and, you know, it's not going to be

17   that, you know, that costly.

18          Well, you know, over the last week, you know, the --

19   the receiver brought in a management company, the receiver has

20   now hired counsel.  And -- and as Your Honor may be aware,

21   once there's a -- a bankruptcy filing, the receiver is then

22   required to just turn everything back over and there --

23   you know, there's some limited procedures where, you know,

24   then they can go to the Bankruptcy Court and have the

25   receiver, you know, reappointed.  But as I understand it,

1   that's more the exception and, you know, not the rule, right?

2          And so what we're trying to avoid is this kind of

3   constant game of zig-zag where there's a receiver appointed

4   and then next week there's a, you know, there's a -- there's a

5   bankruptcy filing, the receiver gives back everything.  And,

6   you know, you can imagine the kind of discord that can cause

7   in, you know, in -- in -- in skilled -- in skilled nursing

8   facilities.

9          And -- and then -- you know, I think the -- the

10  overall important thing, and I think that -- that, you know,

11  in our conversation with Judge Johnston on Friday, he -- he --

12  he appreciated this a little more as well, is that, you know,

13  there's not a -- you know, one of the things that

14  Mr. Ottaviano, you know, said at the -- the hearing, you know,

15  two weeks ago was, oh, there's all these, you know,

16  capitalization and liquidity issues and -- you know, he said,

17  you know, which actually called an irresponsible statement

18  that paychecks had gone out and, you know, they didn't know if

19  they were going to be cashed and things like that.  And, you

20  know, the -- those paychecks were all cashed.  We're sitting

21  here on February 5th, and now all the, you know, the employees

22  have been paid.

23          And so, you know, respectfully, I think there was a

24  lot of bold proclamations made at that hearing about insurance

25  and capitalization and things like that that didn't

1    actually -- that didn't actually prove true.

2         And, you know, the way these organizations are set

3    up -- and I know that we have some -- we have some disputes

4    about, you know, whether that's the proper way to set it up or

5    how it kind of happens in practice.  But we have this group

6    called Petersen, you know, Health network, right, and that's

7    kind of the overarching and that, you know, organization that

8    manages everything at the corporate level, right?  And then

9    there's all these, you know, nursing homes and -- actually,

10   there's like, you know, stadiums and, you know, there's a lot

11   of different, you know, businesses within the -- you know,

12   within that, but that are kind of managed collectively by

13   the -- you know, by corporate.

14        And, you know, there's really a pragmatic issue when

15   you appoint a receiver, you know, over -- you know, in the

16   case of -- in Judge Johnston's case, it was nine, and I think

17   there's, you know, eight or so in this -- in this particular

18   proceeding.  And then you try to break those off, right, from

19   the -- you know, from the -- from the hub, you know, or the

20   way they're traditionally, you know, managed, right, because,

21   you know, there's shared back office functions, you know,

22   some, you know, shared employees.

23        And, again, I think that's one of the areas that,

24   you know, I've seen over the past week has really caused,

25   you know, that -- you know, you know, a lot of tension is

1  that -- is that breaking off.  Whereas, you know, now, as I

2  said, you know, the insurance policy that's being procured is

3  gonna, you know, cover all the entities within the networks.

4  That's not an issue anymore.

5      You know, the -- the -- the -- there's a chief

6  restructuring offer -- officer who -- who Mr. Ottaviano's

7  group and Mr. Flanagan, actually, as the receiver in that

8  case, talked to like every day multiple times a day.  They

9  know him.  He's a receiver in other cases.  He's -- he's

10  overseeing the -- the -- all of the Petersen network right

11  now.

12      One of the impediments to filing for bankruptcy was

13  getting a D&O policy in place --

14      COURT REPORTER:  Sir, please slow down.

15      MR. AHMAD:  That -- that -- that --

16      THE COURT:  Hang on, sir.  Sir, that's my

17  court reporter.  You're talking way too fast.  Slow down.

18      MR. AHMAD:  Oh, my bad.  I apologize.

19      THE COURT:  I told you once to slow down.  You're

20  still going the same speed.  So slow down, please.

21      MR. AHMAD:  My apologies.  My apologies.

22      And so, you know, Mr. Campbell, you know, now has a,

23  you know, D&O policy, you know, ready for -- for him to serve

24  as the chief restructuring officer of the Petersen entities.

25  And so those were all the, you know, impediments that were

1   kind of standing in the way of, you know, of a -- of a filing.

2          And so I think that the, you know, the last thing I

3   would -- I would say to kind of summarize the -- the -- the

4   objections are that, you know -- you know, this -- you know,

5   my read on this -- this motion is again it's an emergency run

6   into court in a case that is at bottom a case at law and --

7   and not at equity.

8          And the -- the -- the factors that were in place when

9   Judge Johnston appointed a receiver, it's a very different

10  record today.  And -- and speaking of the -- the record, there

11  really is not an evidentiary record for this.  I know that,

12  you know, TRO-type proceedings and receivership proceedings

13  sometimes have a, you know, a, you know, a little bit less

14  ordinate of a, you know, of a record.  But, again, a lot of

15  these are proclamations that are being made in -- you know, in

16  motions that weren't true at that time and are not true now.

17         And so, you know, respectfully, those are the basis

18  for the -- for the objections to -- to appointing a receiver

19  over these particular entities.

20         THE COURT:  Okay.  And I'll hear from plaintiff in a

21  minute, but I have a couple of questions.

22         How many patients are involved in the nursing homes

23  at issue in this case?

24         MR. AHMAD:  Sure.  So each of the -- and this is a

25  little bit -- a little bit back-of-the-envelope, you know,

1  honestly, but you're -- you're talking about a couple hundred,
2  I -- I believe, at least.
3      THE COURT:  Okay.  And are you disputing there was a
4  default in this case, because the -- it appears with an
5  acceleration clause the loan documents provide for the
6  appointment of a receiver in the event of a default.  Is there
7  a dispute as to whether there was a default?
8      MR. AHMAD:  Yes.  So, you know, as I understand it,
9  there may be a dispute about whether there -- whether there
10  was a default and whether there was a proper acceleration.
11  Because I think as you saw in the -- in the proceedings,
12  you know, there was a data breach or an intrusion within the
13  Petersen entities.
14      And -- and as I understand it, there were no,
15  you know, payment issues, you know, at that time.  And,
16  you know, whether a, you know, a data breach or the
17  circumstances of it, you know, et cetera, could trigger an
18  acceleration, I think might be one, but I think, you know,
19  presently there -- I mean, we don't -- I guess we don't -- we
20  don't necessarily dispute that.  We haven't made the
21  acceleration, you know, payments.  But I think there might
22  be -- you know, there might be some dispute about whether an
23  acceleration was proper, but I confess, I've not fully studied
24  that issue, Your Honor.
25      THE COURT:  Isn't that case determinative for this

1    motion?  If there was a default that allowed for an

2    acceleration, that the -- at least the documents cited on

3    page 14 at Document 5 provides that a receiver can be

4    appointed.  And I --

5           MR. AHMAD:  You --

6           THE COURT:  -- when you get into a lot of other

7    issues, but that appears to be, I would think, dispositive.

8    Now, I'll hear from plaintiff in a minute, but why don't you

9    respond --

10          MR. AHMAD:  Yeah --

11          THE COURT:  -- to that.

12          MR. AHMAD:  Yes, Your Honor.  And to -- and to that

13    point exactly, the way that those loan documents read is that

14    it -- it lists out a bunch of remedies in the -- in the event

15    of default, right?  And it says, you know, one of them may be

16    petitioning for a receiver.  So you still have to meet all

17    the, you know, legal requirements and equitable requirements

18    to get a receiver.  It's not -- I don't read those as if

19    default, then receiver, right?  It -- it just lists that out

20    as a -- as a potential remedy.

21          THE COURT:  Well, I'm not sure I agree with your

22    reading, but I'll hear from plaintiff.

23          MS. TINKHAM:  Thank you, Your Honor.  This is

24    Paige Tinkham on behalf of the plaintiff.

25          Your Honor, I -- I think it would be probably most

1   useful for me to address defense counsel's points in order as

2   they've done.

3        And if you're having trouble hearing me, the

4   court reporter or yourself, Your Honor, please let me know.

5        THE COURT:  It's not a problem -- it's not a problem

6   hearing anyone.  It's just a matter of speed.  It's hard for

7   my court reporter to get this down when people are on the

8   phone, so you need to go a little slower than you would if you

9   were in court.  Go ahead.

10       MS. TINKHAM:  Sure, absolutely, Your Honor.  And

11   luckily, I didn't have my second cup of coffee this morning so

12   we should be okay.

13       Your Honor, first we heard from defense counsel that

14   some of the bases of Judge Johnston's rulings are not -- no

15   longer the case here or that things have changed.  What we --

16   what we heard about first was the lack of insurance.  And

17   defense counsel indicated that was resolved.

18       My client's been asking for proof of insurance for a

19   very long time.  It still has not been provided.  While I

20   understand from defense counsel, it was faxed over this

21   morning, we have not seen a copy of it.  We don't know if it

22   covers our facilities.  We don't know the date and the terms

23   of it.

24       And I also heard during counsel's presentation that

25   it was being procured.  So I don't know if it's actually been

1  obtained or if it's being procured, in the process, and we --

2  we have no details all that -- on that.  All we know is that

3  it was canceled in December and that may have been retroactive

4  to last year.  We believe that there may be significant

5  litigation.  We don't know because, again, we've asked for

6  this information and haven't received it, but it's a huge

7  loss.  And I'm sure as Your Honor saw in Judge Johnston's

8  transcript, it's just playing with fire not having the

9  insurance.

10      Second --

11      THE COURT:  Well, let me --

12  (Indiscernible crosstalk.)

13      THE COURT:  Let me interrupt you there for a moment.

14      If they do have insurance, does that change your

15  position seeking an appointment of receiver?

16      MS. TINKHAM:  No, it doesn't.  And, you know, I

17  probably should've addressed this first, Your Honor, but we

18  have very clear default here.  I think defense counsel was

19  confusing this case with the *X-Caliber* case, that there are

20  two payment defaults.  That's very cut-and-dried and clear in

21  this case.

22      The defendants here did not make their payments in --

23  due on December 1st, and again they didn't make them on

24  January 1st.  And Mr. Campbell has told the defendants they're

25  not making the February 1st.  So then that's three payments in

1    default.  Those are very clear and clean-cut.  There are no --

2    there's no dispute whether you made the payment or not.  We

3    have -- we've had email correspondence from the defendants to

4    Capital Funding to the [unintelligible] indicating that they

5    were not making their December payments.  There's really no

6    dispute about that.

7           And I agree with Your Honor that the loan documents

8    are actually also different from the *X-Caliber* loan documents

9    where they indicate that a receiver can be appointed upon

10   default.  And that's what we have here.

11          And -- and we have more.  And not just the lack of

12   insurance.  We have a lot of concerns.  We've asked for

13   information routinely, which we were told we're not receiving

14   it, whether it's due to --

15          THE COURT:  Slow down, please.

16          MS. TINKHAM:  -- or whether --

17          THE COURT:  Slow down, please.  Go ahead.

18          MS. TINKHAM:  Apologies, Your Honor.

19          We -- we asked for a lot of information here.  We

20   asked for very basic information.  We asked if the defendants

21   are paying their taxes current.  Are their payroll and

22   provider taxes current, or are they delinquent?  Those are

23   large -- those are big issues with respect to our collateral.

24          We asked whether vendors are shut -- threatening to

25   shut off services.  We received no response.  We know from the

1    *X-Caliber* case -- and Mr. Flanagan is here today and can

2    provide Your Honor information of what he sees since he's been

3    on the ground, but we know that vendors are being stressed and

4    they're threatening to shut off services.  We don't have exact

5    information with respect to our facilities because it hasn't

6    been provided, even though it was asked for over two weeks

7    ago.

8           We've asked whether the funds are being segregated.

9    We know from other facilities that they're not.  That's a huge

10   violation of the HUD rules.  If our -- funds from our

11   facilities are being segregated -- are commingled with other

12   facilities and used to pay their funds where our facilities

13   aren't being funded.  We've asked for the AP agings.  Didn't

14   receive that.  We asked for a 13-week cash flow.  Didn't

15   receive that.

16          All of this information Breslin, Young & -- Young &

17   Slaughter, whose representative is on the phone today, was

18   provided it readily; within half an hour they were provided

19   access to half of this information.  It was denied to

20   Capital Funding.  So there are things we don't know here and

21   we're very concerned about because of what's been seen on the

22   ground.  And Mr. Flanagan can share with you what he has seen

23   being appointed in the other cases.

24          THE COURT:  All right.  Let me --

25          MS. TINKHAM:  Let me go back to --

1    THE COURT:  Let me ask one question.  If a Chapter 7

2  reorganization filing was going to be made, I think in

3  Judge Johnston's case, it has to be made by the receiver, not

4  by the company.  Or am I mistaken on that?

5    MS. TINKHAM:  Your Honor, we have -- as a proposed

6  order does give that, the authority to file the -- a

7  bankruptcy with the receiver upon his appointment.  I think --

8    THE COURT:  In other words --

9    MS. TINKHAM:  -- what Mr. Ahmad is --

10    THE COURT:  In other words, the receiver is the one

11  who decides whether bankruptcy ought to be filed?

12    MS. TINKHAM:  Yes.

13    THE COURT:  And that's the same position in this case

14  if a receiver is appointed?

15    MS. TINKHAM:  Yes, that's our position.

16    THE COURT:  Okay.  Okay.

17    MR. AHMAD:  Your Honor, just to be -- just to be

18  clear, I -- I -- I don't know if that is -- is the case

19  with -- with the other order.  And certainly, when it was

20  discussed at the hearing two weeks ago, that wasn't discussed

21  as one of the premises.  So as -- as -- as I understand it,

22  that decision still kind of rests with the Petersen entities

23  overall, and so, you know, we would obviously object to that

24  being part of it, given the plans that we've, you know,

25  announced and been very forthcoming about.

1          THE COURT:  Well, it seems odd if a receiver is

2    appointed over certain entities since he -- the receiver is

3    not over -- is it over the Petersen holdings or the individual

4    nursing homes, the different LLCs?

5          MS. TINKHAM:  The --

6          MR. AHMAD:  Yeah, the individual LLCs, 'cause

7    they're -- those are the parties to the contracts.

8          THE COURT:  Yeah.  It would seem odd that a receiver

9    would be appointed and some other entity other than the

10   receiver would be able to make the decision and have the

11   authority to make a filing, a bankruptcy filing.  Maybe

12   there's documents that allow it, maybe I'm mistaken on how

13   these procedures work, but I -- receivers run the show if

14   they're appointed.  And the decision of whether a bankruptcy

15   ought to be filed would be made by a receiver.

16         So I don't know if that's called for in the documents

17   before Judge Johnston, but it sounds like counsel here is

18   saying that -- plaintiff's counsel is saying that's going to

19   be the case if a receiver is appointed here.  It's in the

20   document -- the appointment form -- or appointment document

21   for the receiver.

22         But, go ahead, counsel for plaintiff.

23         MS. TINKHAM:  Yes, Your Honor, that is our position.

24   And also, a little more color on that as well, is we've been

25   told for two months that the bankruptcy filing is imminent and

1    it hasn't happened to date.  In the Judge Johnston hearing

2    transcript, you can read that they -- they said it could be

3    filed within hours.  We're two weeks out from that and it

4    still hasn't been filed.  So --

5            THE COURT:  Well --

6            MS. TINKHAM:  -- you know, we can't --

7            THE COURT:  -- it sounds like it's not their decision

8    anymore.  It would be Mr. Flanagan's.

9            MS. TINKHAM:  And that is our position.

10            THE COURT:  And is Mr. Flanagan intending to file

11    bankruptcy in the Rockford case before Judge Johnston?

12            MS. TINKHAM:  We have not --

13            MR. FLANAGAN:  Your Honor, this is -- this is --

14            THE COURT:  Yeah.

15            MR. FLANAGAN:  Your Honor, this is Mike Flanagan.

16            I don't have an intention of filing a bankruptcy

17    proceeding with regard to the eight facilities for which I was

18    appointed in the Rockford matter.

19            THE COURT:  All right.  And if you're appointed here,

20    you don't have a position yet until you, I suppose, get on the

21    ground and look at the -- look at the books to decide whether

22    you're going to seek a bankruptcy in this case?

23            MR. FLANAGAN:  Correct.

24            THE COURT:  Okay.  Okay.

25            All right.  Continue, then, plaintiff's counsel.  I

1  think I was cutting you off with my questions, so you can

2  continue with your presentation.

3  　　　　MS. TINKHAM:  Thank you, Your Honor.  I just had a

4  few more issues to address from counsel's presentation.

5  　　　　With respect to the liquidity issues that were at the

6  facilities in *X-Caliber*, we're -- as I indicated, we're very

7  concerned that they exist here as well because we have not

8  received the information we've asked for.  And, you know, from

9  what Mr. Flanagan has seen on the ground with respect to the

10  *X-Caliber* facilities, we're concerned that they do -- it -- it

11  has harmed all of the facilities.

12  　　　　In briefing from -- in defense counsel's argument

13  that it would be difficult to break these facilities apart,

14  that they should stay with the hub, that things are governed

15  at the hub, and the receivership has caused issues, we very

16  much disagree with that statement.  These -- these entities

17  are separate entities; they're separate homes.  They can be

18  run by receivers.  It happens all the time.

19  　　　　And, actually, many of the discord that has happened

20  has been a refusal by defendants to provide information to the

21  receiver since he got on the ground.  He's been attempting in

22  the *X-Caliber* case to obtain insurance and they didn't give

23  him that information to even try to do that until last

24  Thursday.

25  　　　　They -- there was another issue at one of the

1    facilities right upon his appointment, they transferred a

2    resident with some behavioral issues into the facility so that

3    it would be a receiver's problem, not the defendant's problem.

4    So we're -- we're seeing a lot of concerns here, and I do

5    think that an independent receiver who's an officer of the

6    court is the best thing for these facilities going forward and

7    to be able to maintain them and to, you know, right the ship.

8         And despite many of the health and safety concerns at

9    these facilities, that's public information also available on

10   the Medicare website with respect to tags that they've had,

11   fines that they've had.  They've had to implement plans of

12   correction in order to kind of turn things around for them.

13   Those types of corrections require resources.  And these

14   facilities don't have those resources to commit to them.

15        By appointing a receiver, we have our client,

16   Capital Funding, who's willing to fund the receivership and be

17   able to address all of these health and safety issues.

18        THE COURT:  So Capital Funding is --

19        MS. TINKHAM:  So --

20        THE COURT:  Hang on.

21        Capital Funding is paying for the expenses of

22   Mr. Flanagan and any professionals he hires?

23        MS. TINKHAM:  Your Honor, those -- yes, they are

24   willing to fund shortfalls within the receivership.  So

25   revenues come in from the facilities.  To the extent they're

1   not enough to pay for these facilities, Capital Funding is
2   willing to fund them.
3          THE COURT:  All right.  But they're not the primary
4   financier of Mr. Flanagan and professionals?  That comes from
5   the facilities.  And then if they can't pay, Capital Funding
6   will pay?
7          MS. TINKHAM:  Correct.
8          THE COURT:  All right.  What about the --
9      (Indiscernible crosstalk.)
10          THE COURT:  Who's this?  Who is this?
11          MR. AHMAD:  I'm sorry.  This is Mr. Ahmad.  I just
12   had a quick clarification question on that, Your Honor.
13          THE COURT:  All right.  Slowly, though, okay?
14          MR. AHMAD:  Sure.
15          THE COURT:  Well, actually, hang on.  Let me -- let
16   me finish --
17          MR. AHMAD:  Yeah.
18          THE COURT:  -- with plaintiff's counsel.
19          Are you -- do -- I go back to the original question I
20   asked Mr. Ahmad about the acceleration clause that provides
21   that a -- the secured party, which is plaintiff, is entitled
22   to appointment of a receiver upon the occurrence of an event
23   of default.
24          Is there really a dispute as to that?  And is there a
25   dispute as to whether the acceleration clause permits --

1   can -- whether the acceleration of the debt can take place and

2   whether a receiver can be appointed, which appears to be by

3   agreement back when this contract was entered into?

4              MS. TINKHAM:  Your Honor --

5              THE COURT:  Is there a dispute as to that?

6              MS. TINKHAM:  Your Honor, I do not believe there is a

7   dispute as to that with respect to this case.  I think

8   Mr. Ahmad was referring to the *X-Caliber* documents which were

9   very different.  If you look at the assignment of rents and

10   leases in the operative documents here, defendants agree --

11              COURT REPORTER:  Please slow down.  Please slow down.

12              MS. TINKHAM:  [Unintelligible.]

13              THE COURT:  You've got to -- all right.  Hang on.

14   We're done; we're done.  This is not going to work over the

15   phone.  We're going to hear this in court.  I don't know where

16   everyone is, whether they're in Chicago, whether they're out

17   of town, how long it's going to take you to come in, but I

18   can't -- you're not going to have a record of this proceeding

19   by everyone talking so fast.

20              And I don't need, necessarily, Mr. Flanagan in, I

21   don't need his professionals in, but I do need the attorneys,

22   at least, who are going to make arguments.  I'm inclined to

23   appoint the receiver, but if there is a factual dispute as to

24   whether or not there's been a default and whether or not I

25   have the authority to appoint a receiver based on the

1    agreement of the parties, then I'll hear argument.

2            And if there's going to be evidence heard, we'll do

3    it in court.  But I can't run this -- maybe that's too

4    optimistic, but I can't do this over the phone.  I know

5    Judge Johnston had you in.  I should've taken his lead and

6    done the same thing on this.  I hoped this wouldn't be a great

7    dispute, because of what I view as a pretty clear agreement

8    that at least I'm entitled to appoint a receiver.  But if

9    that's going to be a disputed item, you can all come to court.

10            Emily, when can we hear this?

11            How long do you think it'll be to hear argument and

12    take any evidence on this?  First, from plaintiff's counsel.

13            MS. TINKHAM:  Your Honor, we -- if you just want

14    arguments from counsel, we are available today to come in;

15    tomorrow.  We can -- we can be there as soon as possible.  If

16    you would like evidence, my client is located in Maryland, so

17    they need to travel, so we can hear it as soon as tomorrow.

18            I do think from the loan documents, though, and the

19    citations we have in the papers, that this is a very clear-cut

20    issue.  I appreciate the difficulty over the phone, but I -- I

21    would like to -- I -- I could at least point Your Honor to the

22    provisions we've cited in the papers that really clearly set

23    this forth.

24            THE COURT:  All right.  I want you to talk to defense

25    counsel.  Determine whether or not there are disputes on

1  facts -- the defense counsel seem to indicate there were.  See

2  if there are disputes on facts that would require a hearing.

3  If that's the case, figure out who you're going to bring in

4  for a hearing.

5          Emily, when can we do this tomorrow?

6          THE CLERK:  Judge, looking at the calendar.  We can

7  potentially do between the Maddox sentencing at 11:00 and the

8  Damian v. Courtright phone call at 2:00.  Otherwise, I can ask

9  if the Damian v. Courtright people could maybe set their oral

10  argument -- or their closing arguments a little earlier or a

11  little later than 2:00.

12          THE COURT:  Yeah.

13          MR. AHMAD:  I -- I apologize.  I have a -- I have

14  a -- I'm in a deposition tomorrow.  Is there any way we can do

15  Wednesday?  Humbly.

16          THE COURT:  No, you -- that's fine.

17          Emily, what do we have on Wednesday?  Can we do it

18  after the Staffing hearing?

19          THE CLERK:  Yeah, I don't know that we got a specific

20  time frame for how long they think Staffing is going to last,

21  but we have nothing scheduled after Staffing Services.

22          THE COURT:  How about 3:30 on Wednesday?  Does that

23  work for plaintiff's counsel?

24          MS. TINKHAM:  Yes, Your Honor.

25          THE COURT:  And for defense counsel?

1       MR. AHMAD:  Yes, that -- that would work, Your Honor.

2       THE COURT:  All right.  If you reach agreement before

3  then, tell me.  If you need to both meet and confer and decide

4  whether or not this is going to be a contested hearing or

5  simply argument.  As I said, I'm inclined to grant the motion.

6  I don't know that I -- if it's just going to be argument, you

7  don't need anyone in other than the attorneys.  If it's going

8  to be a hearing, then you need to decide which witnesses

9  you're going to call.

10      I'll hear it at 3:30 on Wednesday, and we'll proceed

11 that way.  We may have to adjust that time.  I need to find

12 out how long the hearing I have at 1:00 o'clock is going to

13 last.  It's a long -- long set evidentiary hearing, and we'll

14 have to check with the parties and make sure they can do it in

15 2 1/2 hours.  But otherwise, we'll hear you at 3:30 on

16 Wednesday.

17      Sorry we couldn't do this over the phone, but it's

18 just impossible.  At the speed everyone's speaking and the

19 need to understand what's being said and create a proper

20 record for it.

21      So any questions from plaintiff?

22      MS. TINKHAM:  No.  Thank you, Your Honor.

23      THE COURT:  And from defendants?

24      MR. AHMAD:  No -- no.  Thank you, Your Honor.

25      And, Paige, I'll call you after this just to kind of

1  discuss logistics, et cetera.

2  　　　　MS. TINKHAM:  Okay.  Thank you.

3  　　　　THE COURT:  And when you reach any kind of agreement

4  on what we're going to do Wednesday, email my courtroom deputy

5  so I know what's coming.

6  　　　　MS. TINKHAM:  Understood.

7  　　　　THE COURT:  All right.  Thank you all.

8  　　(Proceedings concluded at 10:00 a.m.)

9  　　　　　　　　　　　　CERTIFICATE

10  　　I certify that the foregoing is a correct transcript from

11  the record of proceedings in the above-entitled matter.

12  */s/ Elia E. Carrión*　　　　　*25th day of April, 2024*

13  _____    _____
*Elia E. Carrión*　　　　　　　　　　　　*Date*
*Official Court Reporter*

14

15

16

17

18

19

20

21

22

23

24

25