27

```
1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
2                            EASTERN DIVISION

3   CAPITAL FUNDING, LLC, a           )
    Maryland limited liability        )
4   company,                          )
                                      )    Docket No. 24 C 888
5                    Plaintiff,       )
                                      )    Chicago, Illinois
6          v.                         )    February 8, 2024
                                      )    1:01 p.m.
7   BATAVIA, LLC, et al.,             )
                                      )
8                    Defendants.      )

9    TRANSCRIPT OF PROCEEDINGS - Plaintiff's Emergency Motion for
                   Appointment of Receiver - Volume 2
10             BEFORE THE HONORABLE THOMAS M. DURKIN

11

    APPEARANCES:
12

    For the Plaintiff:    MS. PAIGE B. TINKHAM
13                         MR. KENNETH J. OTTAVIANO
                           Blank Rome LLP
14                         444 West Lake Street, Suite 1650
                           Chicago, Illinois  60606
15

16  For the Defendants:   MR. SCOTT AHMAD
                           Winston & Strawn LLP
17                         35 West Wacker Drive
                           Chicago, Illinois  60601-9703
18

19  Also present:         MS. KRISTINA STANGER (Martin Brothers)

20

21

22  Court Reporter:       ELIA E. CARRIÓN, CSR, RPR, CRR, CRC
                           Official Court Reporter
23                         United States District Court
                           219 South Dearborn Street, Room 1432
24                         Chicago, Illinois 60604
                           312.408.7782
25                         Elia_Carrion@ilnd.uscourts.gov
```

1    (Proceedings heard in open court.)

2         THE CLERK:  This is Case No. 24 CV 888, Capital

3    Funding, LLC v. Batavia, LLC.

4         May I please ask the attorneys present on behalf of

5    the plaintiff to state their names.

6         THE COURT:  You can all remain seated and just make

7    sure you speak into a mic.

8         MS. TINKHAM:  Thank you.  On behalf of the plaintiff,

9    Paige Tinkham and Kenneth Ottaviano.  We also have in the

10   courtroom with us Jennifer Loucks from Capital Funding, LLC,

11   the plaintiff, as well as Anthony Hope as a potential witness.

12        THE COURT:  Very good.  Thank you.

13        THE CLERK:  And on behalf of defendants, please.

14        MR. AHMAD:  Good afternoon.  Scott Ahmad from

15   Winston & Strawn on behalf of the defendant entities.  I also

16   have with me Mr. David Campbell, who's here on behalf of the

17   defendant entities as well.

18        THE COURT:  All right.  Very good.  Well, we're here

19   on plaintiff's emergency motion for appointment of a receiver.

20   I heard some oral argument on it the other day, but I realized

21   that it just had too much -- there's too much to cover to

22   handle in a phone call, so I -- we had it reset for today.  I

23   had originally -- I had asked my courtroom deputy to see if

24   the parties intended to call witnesses.  At first, it didn't

25   appear to be so.  Now I think there are witnesses that are

1    going to be called, which is fine.  That's why we're here.

2         So we'll start with plaintiffs.  It's your motion;

3    you have the burden.  And if you intend to call witnesses,

4    that's fine.  If you intend to just argue and make a decision

5    on whether to call witnesses, that's fine too.

6         So how do you want to proceed?

7         MS. TINKHAM:  Your Honor, I believe we can start with

8    argument, and if witnesses are necessary, based upon the

9    defense's position, we can call witnesses thereafter, if that

10   is okay with Your Honor.

11        THE COURT:  That's fine.

12        Mr. Ahmad, how does that work for you?

13        MR. AHMAD:  Yeah, we have no objection proceeding

14   that way as well.

15        THE COURT:  Okay.  Very good.

16        You can argue from the podium -- you have to turn it

17   around toward me -- or you can do it from the tables, which is

18   fine.  That's often how I do it now because the microphones

19   work just fine for my court reporter to pick you up.

20        And I think there's someone listening in, maybe from

21   one of the -- is that from the plaintiffs.

22        MS. TINKHAM:  No, Your Honor.  I believe it's a

23   third-party vendor.

24        THE COURT:  Okay.  Who is on the line, if you can

25   hear me?

1          MS. STANGER:  That's correct, Your Honor.  Good

2     afternoon.  My name is Attorney Kristina Stanger, and I

3     represent Martin Brothers distribution.  Thank you.

4          THE COURT:  All right.  What is -- and I'll ask the

5     attorney in court:  What is Martin Brothers distribution

6     relationship to either side?

7          MS. TINKHAM:  Your Honor, my -- there is no

8     relationship.  I believe -- or I'm sorry; are you asking --

9          THE COURT:  Well, I'll -- actually, I'll ask the

10    person on the phone.

11         What is your relationship to the parties in this

12    case?

13         MS. STANGER:  Thank you, Your Honor.  We are a vendor

14    to the defendant facilities.

15         THE COURT:  Okay.  Very good.

16         MS. STANGER:  We're a food and beverage vendor.

17    Thank you.

18         THE COURT:  Okay.

19         MS. STANGER:  Just monitoring today, Your Honor.

20         THE COURT:  Sounds -- sounds fine.  Thank you very

21    much.

22         Okay.  Then we'll start with plaintiff.  Ms. Tinkham,

23    are you going to argue first?

24         MS. TINKHAM:  Yes, Your Honor.

25         THE COURT:  All right.  Proceed.

1          MS. TINKHAM:  Your Honor, we're here today seeking

2     the appointment of a receiver, as you know --

3          THE COURT:  And you're going to have to slow down

4     even in court.

5          MS. TINKHAM:  Your Honor, as we set forth on Monday,

6     we're here seeking appointment of receiver over the

7     defendants.  These are nine senior care facilities located

8     throughout Illinois, including here in the Northern District,

9     that have the ultimate ownership of an individual named

10    Mark Petersen.

11         These defendants -- there's about 70 homes throughout

12    Illinois.  Capital Funding, the plaintiff here, is a lender on

13    loans to nine of these facilities, which are the defendants

14    subject here.

15         THE COURT:  These are -- these are nursing home

16    facilities.  What is the Petersen relationship to the nursing

17    home facilities?

18         MS. TINKHAM:  Mark Petersen?  Mark Petersen's the

19    ultimate owner.  So if you go up the chain of ownership

20    throughout -- you have the -- you have propcos, property

21    owners, that own each of the real estate where the facilities

22    operate; then you have operators that operate on them.  If you

23    go up both their chains of ownership, you ultimately get to

24    Mr. Petersen.

25         THE COURT:  And who do you have the loan relationship

1    with, the actual LLC, physical buildings --

2              MS. TINKHAM:  Yes.  So --

3              THE COURT:  -- that own the physical buildings?

4              MS. TINKHAM:  There are loans to the owners of the

5    real property that are also guaranteed by the operators of the

6    property in terms of a security agreement where all of the

7    assets were pledged to secure the loan of --

8              THE COURT:  All right.  And then there's assignment

9    of rents, et cetera, to your client too?

10             MS. TINKHAM:  Yes, by the operators.

11             THE COURT:  All right.  Go ahead.

12             MS. TINKHAM:  There's also a master tenant, which

13   really is not relevant to these proceedings.  It is a

14   defendant, but it is, you know, sort of a master tenant that

15   then subleases to the operators so that -- who then lease from

16   the propco.  So in the chain of ownership, but really not

17   relevant to -- to our proceedings here today.  It's just one

18   of the defendants.

19             THE COURT:  And the -- the defendant LLCs, the actual

20   nursing homes themselves, what is -- is Mr. Petersen part of

21   that LLC, or is one of his entities part of the LLC -- one of

22   the principals or -- one of the principals of the LLC or is

23   it --

24             MS. TINKHAM:  Yeah.  If you go up the chain -- so

25   just going back to our diversity allegations within the

1   complaint where I have the chains all laid out, it's 'cause

2   it's not a direct line.  But he is the ultimate owner.  So we

3   have the propco owners...

4          Hold on.

5    (Counsel conferring.)

6          THE COURT:  It's not -- I just want to make sure,

7   Mr. Ahmad, you represent the defendants that are subject to

8   the agreements.  Is that correct?

9          MR. AHMAD:  That's correct, Your Honor.

10          THE COURT:  All right.  And you may represent the --

11   Mr. Petersen or his LLC, but the key entities here, at least

12   for purposes of the -- in my mind, at least, the allegations

13   relating to the defaults are the -- the nine individual LLCs.

14   And you are the attorney for them.

15          MR. AHMAD:  That is correct, Your Honor.

16          THE COURT:  All right.  Very good.

17          You don't have to go further into the ownership --

18          MS. TINKHAM:  Okay.

19          THE COURT:  -- tangles.  I can deal with that at some

20   other time.

21          MS. TINKHAM:  Okay.  Thank you, Your Honor.

22          And just for purposes of ease of descriptions since

23   there are nine defendants, I do refer to them as the Petersen

24   entities.  Not to be confused that it's him, but just so we

25   don't go through all nine here today.

1          THE COURT:  That's fine.

2          MS. TINKHAM:  Okay.  So Capital Funding itself has

3    loans to each of these nine entities.  They're separate loans

4    to each entity, each propco entity.  In agg- -- in the

5    aggregate, they're owed over 19 million on these loans.  Those

6    loans are also insured by HUD, the department of urban

7    development.

8          In January -- beginning in December 2023, the

9    defendants missed their payments on these loans.  So we have

10   payment defaults for December 2023, January 1, 2024, and now

11   February 1, 2024.  I think there was a little bit of dispute

12   on the call on Monday whether that's subject to dispute or

13   not, the payment defaults.  I don't know if defendants are

14   here protesting that today, but I do have in court with me

15   Jennifer Loucks from Capital Funding who is -- who can testify

16   to the payment defaults with her overseeing of the records.

17         The notice of acceleration was sent with her notice

18   of default in the beginning -- in -- in January to the

19   defendants.  It's very clear under the loan documents that if

20   there's a payment default, that that's an event of default

21   under the loan documents.

22         Under the assignment of rents and leases, there's a

23   very clear provision, Section 2(d), that sets forth that the

24   operator agrees that the secured party's entitled to the

25   appointment of a receiver upon the occurrence of an event of

1   default.  We think that's very clear contractual language.

2   There's not ambiguity there with respect to a contractual

3   agreement to appointment --

4           COURT REPORTER:  Slow down, please.

5           THE COURT:  Yeah, it's -- it's -- off the record.

6       (Off-the-record discussion.)

7           THE COURT:  Okay.  Back on the record.

8           MS. TINKHAM:  Thank you, Your Honor.

9           Your Honor, to recap, we think that Section 2(d), the

10  assignments of rents and leases is a very clear contractual

11  provision providing for the appointment of a receiver upon an

12  event of default.

13          THE COURT:  Before we get to the factors beyond that.

14  Do you agree there's been a default and agree that the

15  appointment of a receiver is at least something that is in the

16  documents?  I may have to consider other factors to decide

17  whether or not the appointment is appropriate, but there's

18  been an agreement -- I think the language, in fact, "operator

19  hereby agrees that secured party is entitled to the

20  appointment of a receiver for the healthcare facility upon the

21  occurrence of an event of default hereunder.

22          So my question of you is:  First, do you agree

23  there's been an occurrence of an event of default hereunder?

24          MR. AHMAD:  Yes, Your Honor.  And I told Paige on

25  Monday, we met and conferred after the hearing, that we were

1    not going to be contesting that there was a default.

2           And as to Question 2, again, we acknowledge the

3    language in the loan document.  I'll review during my argument

4    some of the case law that the Court, even despite an agreement

5    like that, has to consider the other equitable factors --

6           THE COURT:  Right.

7           MR. AHMAD:  -- but agreed, Your Honor.

8           THE COURT:  Okay.  Very good.  So I think we can go

9    past that.  I thought that was the position of defendants from

10   our phone call, but now we're really into the issue of the

11   other equitable factors.  That's a key factor, the fact that

12   the plaintiff -- or the defendant, rather, agrees to the

13   appointment of a receiver.  Not necessarily dispositive, but a

14   major factor that I have to consider.  And you should address

15   the other factors that you set forth, and we'll see as you go

16   through them one by one whether there's a contest relating to

17   factual allegations you make.  And if there is, we'll know

18   what the scope of this hearing's going to be like.

19          Go ahead.

20          MS. TINKHAM:  Perfect, Your Honor.

21          Your Honor, in considering the equities outside of

22   the contractual provision, we think one of the major -- first

23   major points is the lack of liquidity on behalf of the

24   defendants.  They have -- we know from other cases they've

25   failed to provide information to my client in this case, which

1    we're -- have the ability to testify to if needed here today.

2    But they are -- they have significantly stretched accounts

3    payable.  We believe that those are two critical vendors of

4    the facilities.  You have food vendors; you have pharma

5    vendors; you have therapy vendors.  We believe they're all

6    significantly stretched.

7           We --

8           THE COURT:  What's the basis of your -- I mean, when

9    someone defaults on the major loan obligation they have,

10   there's always trouble with vendors and other creditors, but

11   what is -- other debtors -- other people that owe money, what

12   is the -- or owed money to.

13          What is the basis for your knowledge that there

14   are -- I think there's -- your belief, based on the Rockford

15   case, is there may be payroll that's being missed; there may

16   be vendors not getting paid.  What is the basis of your

17   knowledge of that relating to these entities?

18          MS. TINKHAM:  Your Honor, because we have not been

19   given the information, which has been requested multiple

20   times, we don't have that information here.  The only basis we

21   have here, we do know this week Capital Funding exercised its

22   rights under its deposit account control agreements with the

23   defendants.  When they did that, the institution holding the

24   account, CIBC, informed them that there was checks that were

25   going to bounce in the account.  There was -- checks had been

38

1   presented for payment.  There was insufficient funds to pay

2   them.  They were informed -- Capital Funding was informed of

3   this.

4        At that time, they said -- the defendants told CIBC

5   that they were going to wire funds into the account from some

6   other account.  We don't know where -- we don't know where the

7   funds are coming from, but we know that they were bouncing

8   checks within our accounts.  That is the only information

9   we've been provided because we've been refused the information

10  we've requested.

11       THE COURT:  And is the information that you requested

12  something required under the loan agreements?

13       MS. TINKHAM:  It's required under the loan

14  agreements.  We also know it's very easy for the defendants to

15  provide.  They very easily provided it in the *X-Caliber* case,

16  the Rockford case, and they refuse to do that here after the

17  order was entered in the *X-Caliber* case.

18       THE COURT:  Well, what -- was there an order -- court

19  order requiring them to turn it over in this case?  I didn't

20  enter one.  Was there anything in Judge Johnston's order that

21  would have covered the entities in this case?

22       MS. TINKHAM:  No.  So the information -- let me just

23  take a step back.  The information should be produced under

24  the loan agreements where they're required to provide

25  information.  It was requested and it was refused.  So that

1  was another breach under the loan agreements of providing the

2  information that they're supposed to provide, but no --

3          THE COURT:  Refused or we'll get back to you?

4          MS. TINKHAM:  We'll get back to you.  And --

5          THE COURT:  Right.  Because I understood from your

6  filing they said, it's beyond our bandwidth to provide you

7  with all the information you're requesting.

8          MS. TINKHAM:  Yes, Your Honor, you're correct.  I --

9  failed to provide would be the correct response.

10         THE COURT:  Okay.  All right.  And is there a

11 timeliness requirement under your loan agreement on when those

12 documents and requests for production of documents has to be

13 accomplished?

14         MS. TINKHAM:  It's a good question, Your Honor, that

15 I can look at the loan documents to confirm for you.  With

16 respect to the ability to provide, though, we know that it

17 is -- for most of it, it's literally a click of a switch to

18 provide it to the consultants.  They provide them access, and

19 then no work is required on behalf of the defendant.  The

20 consultants are able to look at it and analyze it, but that --

21 all of that access was just simply ref- -- not provided.

22         THE COURT:  What have you requested?

23         MS. TINKHAM:  We've requested very basic information.

24 Are you current on paying your taxes?  Are your vendors

25 threatening to shut off services?  Are you segregating funds

1    amongst the facilities?

2        THE COURT:  Those are more interrogatories than

3    documents.  Are there -- does the loan agreement require you

4    to -- require the borrower to answer questions, as opposed to

5    provide documents?

6        MS. TINKHAM:  Your Honor, the -- the loan agreement

7    requires access to information.  I would agree it's not

8    interrogatories.  So if you want to -- even just looking at

9    basic documents, we asked for an AP aging.  That was not

10   provided.

11       THE COURT:  Okay.

12       MS. TINKHAM:  We asked for a 13-week cash flow.  That

13   was not provided.  We asked for proof of liability insurance,

14   and that was not provided.

15       THE COURT:  Okay.  And it looks like -- I heard

16   Mr. Ahmad on the phone saying they just got insurance,

17   although you haven't been provided the policy or proof of

18   that.

19       MS. TINKHAM:  No.  So what we've been provided -- we

20   did -- right after the hearing on Monday, Mr. Ahmad provided a

21   specimen preview of insurance, so it's not been issued.  The

22   document we received on Monday didn't list who that -- who

23   that policy would cover; it didn't identify whether it had

24   been paid for or not.

25       Today, right before the hearing, we received a second

1  new document that does list all of the facilities as

2  attachments.  However, it does not meet the requirements under

3  the loan agreement for insurance.  HUD requires to be named as

4  an additional insured.  That's not set forth on the

5  certificate.  As well as Capital Funding as an additional

6  insured, that's not set forth in the certificate.

7          And the big issue with the insurance is, it's just a

8  preview.  It has not been issued, nor do we know if the

9  defendant has funds to actually pay for it.  What we had been

10 told is that they were going to seek funding from the lenders

11 to pay for insurance.

12         Nobody has contacted Capital Funding --

13         THE COURT:  You're the lenders, so you'd know if you

14 got contacted.

15         MS. TINKHAM:  Yes.  No one's contacted us.

16         THE COURT:  Okay.

17         MS. TINKHAM:  So we don't know that there's funding

18 for it.

19         THE COURT:  Okay.  Continue.  What other -- my

20 questions related to what you hadn't gotten that you believe

21 you were entitled to get under the loan documents.

22         MS. TINKHAM:  Uh-huh.

23         THE COURT:  And that would provide you proof of the

24 illiquidity of the defendants, beyond the obvious proof of

25 that by the nonpayment of -- on the notes --

1         MS. TINKHAM:  Yes.

2         THE COURT:  -- unsecured notes.

3         MS. TINKHAM:  We also -- we do have -- we have

4    attached to Jennifer Loucks's declaration that was submitted

5    with the motion, you know, we have emails from the defendant

6    saying they're -- they have been financially crippled by their

7    cyberattack.  We -- you know, they have made multiple

8    statements of their financial difficulties.  We just have not

9    been provided the documents to put into evidence to show that.

10        THE COURT:  Okay.  All right.  I think I understand

11   the issue, but is there more -- and I'll give you a chance to

12   speak more, but that --

13        MS. TINKHAM:  With respect to --

14        THE COURT:  -- are there other things you want to

15   address as to the equitable reason why a non -- not just the

16   language from the -- Section 2(d), but is there other

17   considerations that you want to present that I should

18   consider?

19        MS. TINKHAM:  There are, Your Honor.  We're very

20   concerned about the health and safety of these residents.  In

21   order to maintain these facilities, liquidity and funding is

22   required.  And if it is not there, you know, these residences

23   are at risk of not receiving their basic life requirements of

24   food, pharma.

25        I think that leads over a little bit into what we

1  just talked to.  But separately, these facilities have issues

2  of very difficult rating.  So Medicare gives a star rating.

3  These facilities are one star out of five.  One being the

4  lowest on the totem pole.  These facilities have abuse icons,

5  which means that there have been significant issues at the

6  facilities.  The -- in the last -- let's see.  In the last

7  survey cycle they were cited for fines, as well as days for

8  denial of payment of new admissions.

9         THE COURT:  Well, let me ask you this:  And I've read

10 that in your memorandum, so I'm not cutting you off.  I did

11 see that.

12        Who has responsibility for inspecting these?  The

13 Illinois Department of Health or Medicare or --

14        MS. TINKHAM:  Yeah --

15        THE COURT:  -- or a combination of both?

16        MS. TINKHAM:  -- the Illinois Department of Health

17 inspects these facilities.

18        THE COURT:  All right.  And -- and -- I don't know

19 whether the patients or tenants or residents receive

20 substandard care, adequate care.  It's not in my limited

21 experience the fact that a -- a healthcare facility, whether

22 it's a world-renowned hospital or a nursing home, is going to

23 get violations.

24        MS. TINKHAM:  Uh-huh.

25        THE COURT:  How serious they are or not is not a

1   matter in my -- that I can comment on with any degree of

2   certainty.  But what would improve if a receiver came in?  If

3   you believe the health and welfare of the residents is in

4   jeopardy -- which might be if the defendants don't have any

5   money -- what -- how will things improve if a receiver comes

6   in for the -- for these residents and patients?

7          MS. TINKHAM:  I think there's two main re- -- two

8   main ways that it will improve.  First, all of these

9   deficiencies, they require a plan of action.  They require --

10  the plan of action is a correction plan that the State

11  requires in order to fix them.  Those plans of actions to put

12  them in place require funding and money to put them in place.

13  If you can't hire more staff, if you can't train staff

14  properly, if you can't im- -- implement those plans, then

15  you're unable to carry it out and things are just going to

16  continue to deteriorate.

17         Number two, with a receiver coming in, a new

18  management company will come in.  The management company will

19  be able to come in.  They have the right resources, they have

20  the right properly trained staff and oversight in order to

21  help correct all of these issues at the facilities and make

22  sure that they're well run.

23         The management company, as well as the receiver, are

24  very well-known with the Illinois Department of Health and

25  know how to run these facilities and are committed to doing so

1    with --

2              THE COURT:  What's the relationship between the

3    receiver and the management company?

4              MS. TINKHAM:  They are completely separate

5    independent entities.  They have worked together, but they

6    have no corporate connection.

7              THE COURT:  So the receiver in that circumstance, it

8    would almost be a CEO or a COO employing a management company

9    that is on the ground working at the various facilities.

10             MS. TINKHAM:  Correct, with the ultimate

11   responsibility and, you know, duty to the court as an

12   independent officer of the court.

13             THE COURT:  And then the plan of action that you

14   spoke about that would have to be funded by someone --

15             MS. TINKHAM:  Uh-huh.

16             THE COURT:  -- has the Illinois Department of Health

17   required the defendants to come up with a plan of action?

18             MS. TINKHAM:  My understanding is there are plans of

19   action for all of these facilities where they have been cited

20   with these deficiencies that are required to be carried out.

21             And my -- my -- Jennifer Loucks from Capital Funding

22   is able to testify to those.

23             THE COURT:  And testify that they haven't been

24   funded?

25             MS. TINKHAM:  Testify that they would require

1    funding.

2              THE COURT:  Okay.

3              MS. TINKHAM:  So if -- if there isn't funding to

4    carry it out, you're never going to be able to continue

5    upholding your obligations.

6              THE COURT:  Yeah.  Well, I guess my question is,

7    has -- the first step:  Has the Illinois Department of Health,

8    based on a review of the violations, said there needs to be a

9    plan of action to correct it?  They've said what you need to

10   do, and there has been no action taken on the plan of action

11   because there's no money to do it.

12             Has -- where in the process is that?

13             MS. TINKHAM:  No, I believe that these plans of

14   action were put in over time as deficiencies were cited, so

15   some of these go back over the past year.  And plans of action

16   have started to be implemented.  They just are required to

17   continue carrying them out.  And without the funding, my point

18   is, they can't continue to be carried out.

19             THE COURT:  Wouldn't the Illinois Department of

20   Health have a report of some kind if something that's been

21   required to be performed hasn't been, or is that -- is it

22   premature?

23             MS. TINKHAM:  Yeah, it would depend on when they're

24   in there to do their survey and to decide -- and they're

25   monitoring, which is where they know where it is in the

1  process.  I don't think it's something that is a daily --

2          THE COURT:  Okay.

3          MS. TINKHAM:  -- tally.

4          THE COURT:  All right.  Anything else that I should

5  be considering on the, you know, the other reasons why a

6  receiver is appropriate?  I think I clearly have the legal

7  ability to appoint one.  I don't think the federal rules

8  prevent me from doing it.  I think -- and I've appointed

9  receivers on other cases in the past.

10         I don't -- unless, Mr. Ahmad, when you speak, you can

11  speak to whether or not I'm acting beyond my authority if I

12  appoint one, but I believe I have the authority to do it.  And

13  I believe one -- one factor is the agreement of a defendant to

14  a receiver, at least the entitlement to a receiver based on

15  the loan documents.  Not necessarily dispositive, but it's a

16  major factor.

17         But is there any reason I can't do it legally,

18  understanding that you have the right to argue I shouldn't?

19         MR. AHMAD:  No, Your Honor.  I actually agree with

20  that analysis.  I think when -- when -- humbly, when we spoke

21  on Monday, you seemed to be questioning or, you know, of the

22  view that the agreement in and of itself --

23         THE COURT:  Right.

24         MR. AHMAD:  -- was dispositive, and that's where the

25  law says it's actually one factor.  An important one, I agree

1  with you.  And that's actually kind of the exact legal

2  analysis, correct.

3      THE COURT:  Okay.  All right.  So I think we're all

4  on the same page on that.

5      Does plaintiff agree with that?

6      MS. TINKHAM:  Yes, Your Honor.  And -- and I do just

7  have one additional point we think weighs in support of

8  appointment of receiver, if I may just summarize here.  But we

9  believe that, you know, Mr. Petersen, who is the ultimate

10  owner, he is absent.  He has not been present at these

11  facilities.  We've been told he is unavailable for a

12  significant amount of time.

13      Mr. Campbell has been brought in, but he's a

14  consultant.  He is not an officer of the company, and there's

15  absent ownership, which I do believe was actually a recent

16  citing on other -- not these defendants, but other facilities

17  by the Illinois Department of Health recently.

18      THE COURT:  What -- can you tell me, if you're

19  allowed to and if you have knowledge of, what can you tell me

20  about the findings of the receiver in the Rockford case so

21  far?

22      MS. TINKHAM:  If I can just have --

23      THE COURT:  And if it's --

24      MS. TINKHAM:  -- a second.

25      THE COURT:  -- if it's something confidential that

1    shouldn't be disclosed publicly or in the presence of other

2    facilities, you don't have to, but if it's something that

3    you're comfortable disclosing, I'd like to know what -- what

4    that receiver's found.

5          MS. TINKHAM:  If I can just have a second.

6          THE COURT:  Go ahead and speak to your colleague;

7    sure.

8       (Counsel conferring.)

9          MS. TINKHAM:  Your -- Your Honor, I'm not comfortable

10   sharing the findings of the other facilities.

11         THE COURT:  That's fine.  If I think it's important,

12   I'll ask Judge Johnston to see if he'll modify his order to

13   allow disclosure to me, but that's fine.  I didn't know if

14   there was something that could be publicly disclosed.

15         Okay.  Anything else from plaintiff?

16         MS. TINKHAM:  No, Your Honor.  I just --

17         THE COURT:  I won't foreclose your ability to call

18   witnesses if there's a fact issue that needs to be -- or I'd

19   need to hear testimony about.  Okay.

20         All right.  Mr. Ahmad, on behalf of the defendants.

21         MR. AHMAD:  Thank you, Your Honor.  And again, for

22   the record, Scott Ahmad from Winston & Strawn on behalf of the

23   defendants.

24         I think if Your Honor's okay with it, I -- I won't

25   retread the law, because I think we're in -- in general

1    agreement on that.  Maybe I'll touch on it at the end if any

2    issues come up with it, but the legal standard itself --

3           THE COURT:  Slow down.

4           MR. AHMAD:  Oh, sorry.

5           -- the -- the legal standard itself, we -- we agree

6    with how it was -- how it was stated.  We -- we acknowledge

7    those provisions in the agreement.  We're not contesting that

8    there was an event of default.  But we think that under

9    Rule 66 in the case law, the Court is still required to -- to

10   weigh the other equitable factors, albeit acknowledging that

11   consent in an agreement is an important factor as well.

12          THE COURT:  Okay.

13          MR. AHMAD:  Okay.  In terms of the -- the objection

14   points that we contest, Your Honor, so, first of all, and I'll

15   cover this in a little bit more specific, but none of this --

16   the issues that were raised are actually an emergency, right?

17   A lot of these -- and -- and some of those even came up were

18   things that these creditors, who are extremely sophisticated

19   creditors, have known about for a very long time, or were

20   issues in the home well before recent months.

21          I'd like to go to patient harm next, which is one of

22   the issues that they raised.  They have no evidence, they have

23   cited not one evidence of one patient in these particular

24   defendant facilities that has been harmed as a result of the

25   data breach or the recent situation within the -- within these

1    defendant entities.  They talked of tags; they talked of

2    regulatory situations and correction plans.  And as Your Honor

3    pointed out, those are somewhat of a typical thing in -- in

4    nursing homes.  There's not one incident, for example, of, oh,

5    three weeks ago, there was a news article that -- that this --

6    this facility got tagged; there was a, you know, report of

7    this.

8         There -- there's not one single ev- -- it's -- it's

9    one thing to come into court and say, Oh, well, these things

10   are plagued by tags.  These are sophisticated lenders that get

11   regular reports and information, monitor these facilities and

12   have access to the same public information that -- that we do,

13   and haven't cited any recent things in December or January.  I

14   think that's very important coming in here on -- on an

15   emergency motion and pretending like -- like there's been some

16   situation or status quo that has -- that has changed.

17        Another very important point -- and I was at the

18   hearing before Judge Johnston.  One of the -- the primary, if

19   not the -- the most salient basis for Judge Johnston's opinion

20   was the lack of PGL insurance within those particular

21   defendant entities.  And Mr. -- we have a great relationship

22   with Mr. Ottaviano.  Sat there in court and said, Your Honor,

23   I'm telling you, I've seen these cases; they're never going to

24   get the insurance, et cetera, et cetera, et cetera.  And I

25   said, We're working on it; we're working on it; we're working

1    on it.

2              Look where we're at a week from now.  We -- we have

3    the insurance.  And I've been forthcoming in providing them

4    that information.  As -- as Paige noted, Monday after the

5    hearing, I sent them what we had.  This morning, I got an

6    update with the schedule with all -- with all the covered

7    entities, which will --

8              THE COURT:  How are you going to pay for it?

9              MR. AHMAD:  -- which will include the defendant

10   ent- -- so the policy is now bound, and we have 30 days to pay

11   for it.

12             So two things to -- to make sure are important on

13   that.  Number one, because we've now bound the policy, we are

14   now permitted to -- to file for bankruptcy or seek

15   court-ordered reorganization.

16             THE COURT:  Yeah, I had that question before.

17             MR. AHMAD:  Yeah.

18             THE COURT:  What prevents an entity, such as those

19   you represent, from filing bankruptcy if they don't have

20   insurance?  What difference does it make?

21             MR. AHMAD:  Yeah, so the -- it's a complicated issue.

22   And I confess that I'm actually not a bankruptcy expert, but

23   as I understand it, if you don't have that, you can get kicked

24   out of the bankruptcy.

25             And then the other thing, which -- which I think is

1    the more important one, and -- and apologies if I'm misstating

2    or oversimplifying any of it, I think the other issue is that

3    when you go into bankruptcy, you procure all this bankruptcy

4    and reorganization, you know, funding to pay for the service

5    professionals and, you know, and things like that, and if you

6    don't have the insurance in place, then you can't get that

7    funding to take you through the -- through the bankruptcy.

8    And so it is an important impediment or -- or thing to -- to

9    get into -- to bankruptcy.  But I confess, I -- I don't know

10   all the details of that myself, other than it is a -- it is

11   apparently a pretty important requirement.

12            THE COURT:  All right.

13            MR. AHMAD:  And then, yeah, on the -- on the -- on

14   the payment issue, I think it's three things.  So, you know,

15   one, we are in some negotiations with the State to, you know,

16   advance Medicaid.  Because, you know, one of the things that,

17   you know, Paige referred to, you know, time and time again

18   is -- is liquidity issues, right?

19            But that begs the question -- right? -- of, like,

20   you know, what happens in these nursing homes is it's all

21   centered around timing of payments -- right? -- and when

22   you're getting your State, you know, payments from, you know,

23   from Medicaid, right?

24            And so one of the things that I -- I -- I know

25   Mr. Campbell is exploring is getting that from there.  There's

54

1   also possibly -- now that we have insurance and can -- can --

2   can work to get financing in the context of a -- of a

3   bankruptcy, that may be another way that we'll be able to

4   finance the -- finance the insurance through that way.

5          So we are pretty confident now that we have the

6   policy bound that we are going to be able to pay for it within

7   the next -- within the next 30 days, especially that, you

8   know, the likelihood is now that we're going to -- to be able

9   to seek a court-ordered dissolution proceeding, okay?

10         And -- but --

11         THE COURT:  And the carrier knows you're going --

12  who's the carrier, Lloyd's?

13         MR. AHMAD:  No, AXA.

14         THE COURT:  AX -- all right.

15         MR. AHMAD:  Yeah.

16         THE COURT:  They know you're --

17         MR. AHMAD:  Yeah, yeah, it's my understanding they

18  deal with these things -- they deal with these things all the

19  time, yeah.  So these all would have been disclosed to them,

20  and I was talking to Mr. Campbell --

21         COURT REPORTER:  Slow down.

22         THE COURT:  Slow down.

23         MR. AHMAD:  Oh.

24         THE COURT:  And let me complete my question --

25         MR. AHMAD:  Yeah.

55

1      THE COURT:  -- so I -- you're answering the question

2  I had.

3      The insurance carrier knows you're imminently going

4  to be filing bankruptcy?

5      MR. CAMPBELL:  Yeah.

6      THE COURT:  And you have to be in front of a mic if

7  you're going to --

8      MR. CAMPBELL:  I'm sorry; yeah.

9      THE COURT:  Just pull it over.

10      MR. CAMPBELL:  Sorry.

11      Yeah, that -- that has been -- had been conveyed to

12  the broker who was surveying the market, which -- who is our

13  face to the market and communicated to the carrier.  So we,

14  obviously, need to make sure that there are no triggers which

15  would negate the -- the insurance.

16      THE COURT:  It -- well, I'm not an insurance expert.

17  It just seems interesting that a carrier, when you've lost

18  insurance -- you had insurance and you lost it, correct?

19      MR. AHMAD:  Correct.

20      THE COURT:  How'd you lose it?

21      MR. AHMAD:  It -- it lapsed.

22      THE COURT:  Well, it lapsed, but why did it lapse?

23  Couldn't make payments?

24      MR. AHMAD:  Yeah, I believe it had to do with a

25  payment issue.

1    THE COURT:  All right.  Well, it would seem odd

2  another carrier would come in with an imminent bankruptcy

3  filing.  Of course, it hasn't -- hasn't accrued yet or -- I

4  don't believe.  You don't have insurance, literally, at this

5  moment, correct?

6    MR. AHMAD:  We do.  No, we do literally have -- have

7  it this moment, yes.

8    THE COURT:  All right.  But is it contingent on

9  paying?

10    MR. AHMAD:  Well, so, of course, if we didn't pay

11  within 30 days, of course, they could -- they could then

12  cancel, correct.

13    THE COURT:  Okay.

14    MR. AHMAD:  Correct.  But -- but the one point on

15  that, Your Honor, remember is, is once we procure the --

16  the -- the financing to go into bankruptcy, then part of that

17  financing, that could be one of the sources that covers the --

18  the insurance policy, which is why -- which is why they are

19  willing to do that in those circumstances, issue a policy

20  subject to that.

21    THE COURT:  All right.  If the bankruptcy receiver or

22  trustee authorizes that payment?

23    MR. AHMAD:  Correct.

24    THE COURT:  All right.  Because they'll have a number

25  of competing creditors seeking payment.  Maybe the

1     insurance -- maybe secured creditors that have priority over

2     the insurance carrier, such as the plaintiffs.

3           How does the carrier -- again, I'm getting into a

4     decision -- something the bankruptcy trustee will have to

5     decide, but you've got almost $20 million in secured debt

6     that, I think, takes priority over unsecured debt.  How is a

7     carrier going to get paid?  You don't have $20 million, I

8     don't think.  If you did, you wouldn't be in this position.

9           And if the carrier's behind the line with secured

10    creditors, the major one being likely the plaintiffs, again,

11    I -- maybe I'm misunderstanding how these things work, but I

12    don't know how that's going to happen.

13          Now, if you need to talk to your client, you can, or

14    he can explain it.  I'm happy to be educated on this.

15          MR. AHMAD:  Yeah, and there's a lot of different ways

16    that it happens, and -- and I'm sure David will shake his head

17    if I'm wrong.  But, for example, you know, like, with the --

18    with these lenders and other lenders in the discussions that

19    were happening in December and January, you know, we were

20    asking them to, you know, contribute escrow and things like

21    that.  But, obviously, everybody has an interest, all of the

22    lenders -- right? -- in making sure that the operations and

23    everything survives, so that there are assets preserved.

24          And so I think -- you know, it's my understanding --

25          THE COURT:  Well, that's why they want a receiver.

1    MR. AHMAD:  Right, that the trustee and the -- you

2 know, and the creditors then, you know, would work that out in

3 a -- you know, in a bankruptcy proceeding to make sure that,

4 you know, those costs are being paid.

5    THE COURT:  Okay.  Go ahead.

6    MR. AHMAD:  They made an allegation that payroll

7 hasn't been being made.  That's an incorrect allegation that

8 payroll is being made.  Mr. Ottaviano again said in court two

9 weeks ago the payroll checks have been cut.  This was at the

10 end of January.  Those checks are going to bounce.  They

11 didn't bounce.  The -- the payroll has been paid.  There's no

12 evidence that people's paychecks aren't cashing.

13    THE COURT:  Well, was he speaking about the

14 defendants in Rockford, these defendants, or is the payroll

15 for all of them a collective enterprise?  If he said it

16 two weeks ago in Rockford, that relates to a different group

17 of defendants than these.

18    MR. AHMAD:  No, those -- those -- those payments go

19 out from a more general fund, as --

20    THE COURT:  Okay.

21    MR. AHMAD:  -- yeah, as I understand it.

22    And as I understand it, that CIBC account --

23    MR. CAMPBELL:  Uh, no.

24    MR. AHMAD:  -- that they -- they --

25    THE COURT:  Oh, hang on.

1    MR. CAMPBELL:  I can -- I can explain that, if that

2 would help, Your Honor.

3    THE COURT:  Well, yeah, if -- if there was a

4 representation made in court last week that -- or two weeks

5 ago, whatever it was, before Judge Johnston, that people

6 aren't getting paid -- or they are getting paid, how does that

7 carry over to the payment of employees in this case for which

8 plaintiffs claim they haven't gotten the records that would

9 show if people are getting paid or not?

10    MR. CAMPBELL:  Would you like me to answer?

11    THE COURT:  I would.

12    MR. CAMPBELL:  Okay.  So there -- we have, across the

13 Petersen enterprises, so that would include these -- these

14 plaintiffs here, as well as many other assets, if you will, or

15 homes, there has not been a missed payroll.  The way we make

16 payroll -- so each -- Attorney Tinkham referenced the opcos.

17 Each operating company has three bank accounts, two of which

18 receive funds from government payers; one which we pay bills

19 out of.  And they are very -- they are specific to that

20 distinct operating company.

21    That operating account is a -- what's called a ZBA

22 account, a zero balance account, so that we never have any

23 cash in it.  So what we do is we will write $200,000 of

24 payroll checks.  We will then move into that operating account

25 from the depository accounts $200,000.  That is -- and -- and

1    we do that because the payroll that we cut out of a distinct

2    property, or a distinct opco, are for those employees at that

3    opco.  Now, of course, we do have corporate employees and

4    things like that, which don't bear here, but there has not

5    been any payroll missed, and that's the tactical steps that

6    are involved in -- in making those -- those disbursements.

7           THE COURT:  All right.  Do you have evidence to the

8    contrary on the plaintiff's side?

9           MR. OTTAVIANO:  Your Honor, Kenneth Ottaviano on

10   behalf of the plaintiff.

11          That was raised in the Rockford matter.  I don't

12   believe that was raised in this matter.  Again, we were not

13   provided information in this matter.

14          THE COURT:  All right.  Well, what do you mean

15   "raised in the Rockford matter"?  Was there evidence in the

16   Rockford case that payroll was missed?

17          MR. OTTAVIANO:  No.  I believe my exact quote was --

18   because it was not Friday yet -- that there's a possibility --

19          THE COURT:  Okay.

20          MR. OTTAVIANO:  -- that payroll would be missed.

21          THE COURT:  All right.  And the representation from

22   your client is that no payroll has been missed?

23          MR. CAMPBELL:  That is correct.

24          THE COURT:  Is it twice -- twice a month or every two

25   weeks?

1          MR. CAMPBELL:  15th and 30th.

2          THE COURT:  Okay.  And the last payment was made --

3  what is today?  The 8th?  So your next payment's due in a

4  week.

5          MR. CAMPBELL:  Correct.

6          THE COURT:  Okay.  But the one on January 30th was

7  made --

8          MR. CAMPBELL:  Yes, it was.

9          THE COURT:  -- for all entities in this case?

10          MR. CAMPBELL:  Correct.

11          THE COURT:  And all entities in the Rockford case?

12          MR. CAMPBELL:  Correct.

13          THE COURT:  Okay.

14          MR. CAMPBELL:  Well, I'm -- I'm sorry; let me

15  rephrase that.  Because of the receiver in the receivership

16  order --

17          THE COURT:  Yeah.

18          MR. CAMPBELL:  -- we -- we don't have the visibility

19  that we did prior to the receiver.  So I can only make

20  statements up until the appointment of that receiver.  After

21  that, I cannot make any statements --

22          THE COURT:  Understood.  Okay.

23          And what are the balances in the government-funded

24  accounts?  Are there sufficient funds there to fund your next

25  payment on the --

1          MR. CAMPBELL:  Our next payrolls?

2          THE COURT:  -- yeah, your next payroll in this month

3    and the middle of this month?

4          MR. CAMPBELL:  Yes.  Based on my conversations with

5    the principal, Mark Petersen, late yesterday afternoon, when

6    we talk about cash and cash requirements, we did have

7    sufficient cash to do that.

8          In addition, we do collect cash and receivables on a

9    daily basis, so we -- we know how much is coming in at what

10   parts of the month in order to -- to make sure there's

11   sufficient liquidity to make those -- not only the payroll

12   payments, but any other critical vendors that may need to be

13   paid at that time.

14         THE COURT:  How about the plaintiffs?

15         MR. CAMPBELL:  In --

16         THE COURT:  Yeah.

17         MR. CAMPBELL:  -- in those -- in those -- yes.

18         THE COURT:  Are they paid out of the individual

19   accounts?

20         MR. CAMPBELL:  They are paid out of -- each of those

21   payrolls are paid out of those specific individual accounts.

22         THE COURT:  No, I'm -- I'm -- my -- I'm sorry; my

23   question wasn't clear.

24         Where do the payments to the plaintiff, Capital

25   Funding, where do they come from?

1          MR. CAMPBELL:  They would come from those accounts.

2          THE COURT:  The individual accounts?

3          MR. CAMPBELL:  Yeah, those individual accounts,

4   correct.

5          THE COURT:  All right.  Is there any provision to pay

6   the accelerated loan or even make the monthly payments out of

7   those accounts?

8          MR. CAMPBELL:  At -- at this point in time, there is

9   not sufficient liquidity for -- and we can -- I'm -- I'm happy

10  to -- to explain that and the challenges.  But if we had

11  had -- certainly, if we had had sufficient liquidity to make

12  the loan payments for the plaintiffs, we would have done so,

13  as we had up until our first payment default, which was in

14  December, I believe.

15         THE COURT:  Okay.  All right.  Go ahead.

16         MR. AHMAD:  And then just turning to a couple last

17  points, Your Honor, provision of information.  And the order

18  of things is important.  We got a receivership granted against

19  eight of the entities in the Rockford case on -- it was

20  January 25th, January 26th.  Immediately after that,

21  plaintiff's counsel signed up another client, then they

22  started making information requests.

23         So when you look at the date of those information

24  requests that Paige is referring to, they're January 30th --

25  right? -- so the end of last month.  They say:  "Please

1    provide this list of information now." And there was -- there

2    was a representation made, which was somewhat corrected, which

3    was: We refuse to provide the information.

4          And I'll read Mr. Campbell's email into the record.

5          "We are in receipt of the request" --

6          THE COURT: Slow down if you're going to read it.

7          MR. AHMAD: -- "but with the limited management team

8    bandwidth and the court-ordered receiver action, we are

9    mandated to focus on that workstream for the next few days."

10          There's never been a refusal to provide information.

11    We're working on providing that information. I think we heard

12    statements from Paige that I've been updating them on the

13    insurance. I know David is working on the financials. The --

14    the Petersen team and Mr. Campbell are working -- we obviously

15    have a limited time and limited resources -- are working

16    around the clock on these information requests.

17          Mr. Campbell even canceled a personal trip this

18    weekend so that everyone can be working on these things.

19    We've spent the last two weeks, Your Honor, integrating a

20    receiver -- right? -- into -- into eight of the properties.

21          And as a matter of fact, in that receiver action -- I

22    forget the gentleman's name who testified from the other

23    entities. He said, Actually, yeah, they've been very

24    forthcoming with respect to information. We had -- our

25    forensic person was allowed to -- was allowed to come on site.

1   They had given all the books and records.  They -- they

2   actually concede in their papers there's been no allegation

3   of -- of fraud or, you know, or anything like that.

4        Mr. Campbell, since he's come on has -- has tried to

5   be very forthcoming.  We're going to -- we're going to get

6   them all that information, because we've been providing it

7   to -- to all creditors.  So there's not been a refusal to

8   provide information.

9        THE COURT:  How long has Mr. Campbell been on the

10  scene for these companies?

11       MR. AHMAD:  He was -- he was retained in late

12  December, Your Honor.

13       THE COURT:  Okay.

14       MR. AHMAD:  Yeah.

15       THE COURT:  Okay.

16       MR. AHMAD:  Yeah.

17       THE COURT:  All right.  Go ahead.

18       MR. AHMAD:  There -- there -- there was a lot in

19  the -- in the -- in the papers just in the motion just one

20  sentence on this about there was a forensic analysis done, um,

21  of the other entities.  Um, there's been no forensic analysis

22  done of these particular entities -- right? -- and so we -- we

23  would object to any use of some forensic analysis, which we

24  never actually were provided.

25       Their client testified in the Rockford hearing about

1   his interpretation of the forensic analysis that was done, but

2   there's been -- there's been none, and there's no record of --

3   yet of anything like that with respect to those properties.

4            Now, we are working to, you know, get them the

5   information, and maybe that's an issue they'll want to --

6   they'll want to take up at that time.

7            And then just a couple few last points.  There was a

8   lot of talk about liquidity and stretching.  You know, as I

9   read the -- the case law, I don't know that illiquidity in and

10  of itself is a basis for -- for a receiver.

11           One of the other things about liquidity is that we've

12  approached all of the creditors and asked them to release

13  escrow to kind of help us get into, you know, bankruptcy and

14  facilitate operations.  All of them have refused to provide

15  additional funding and capital for that purpose.

16           THE COURT:  They're under no obligation to do it, are

17  they?

18           MR. AHMAD:  Understood.  But they could, and -- and

19  often do, by the way, in these -- in these situations.  Butera

20  [sic] is Mr. Flan- -- is the -- or so Mr. Flanagan is the

21  proposed receiver here.

22           THE COURT:  Yes.

23           MR. AHMAD:  Butera is the management company that he

24  works with.  Butera has just as many tags and complaints as,

25  you know, any other -- you know, any other management company.

1  I know they didn't want to get into any issues of the other

2  receiverships, so I won't.  But suffice it to say, there's

3  been some, you know, growing pains and operations.  It's --

4  it's hard for me to tell whether that's, you know,

5  run-of-the-mill things with getting a receivership off the

6  ground -- right? -- or other some true issues that, you know,

7  are -- are issues when you try to break off entities that are

8  managed like this and, you know, and segregate them.  But we

9  talked a little bit about -- about that at the hearing on --

10  on Monday.

11          And then, you know, I think the last two things,

12  Your Honor, is we obviously object to the -- to the

13  appointment of a receiver.  We don't think there's a record

14  for it, we don't think there's an emergency, and -- and we

15  think a lot of the facts that they've alleged about this just

16  aren't -- aren't plain correct.

17          If Your Honor is inclined to -- to, you know, to

18  grant a receiver, I think there's -- you know, there's two

19  things that are pretty important to us.  You know, I think one

20  of the things we would propose would be that Mr. Campbell, as

21  opposed to Mr. Flanagan, be appointed at the -- as the

22  receiver, given his already -- I mean, he's essentially

23  functioning in that role and he's -- and when we file, he's

24  going to be appointed the chief restructuring officer, and he

25  has experience in these things and he can testify about that,

1  if you're interested in hearing his -- his experience in these

2  types of matters.

3      And then I think the other thing that we had a

4  colloquy about on Monday was, you know, we've been very open

5  about kind of what our -- what our plans are with respect to

6  the -- to the -- to the reorg.  And, you know, because we

7  think there's been a -- you know, my characterization --

8  right? -- an incorrect, you know, emergency, you know, button

9  pushed here, you know, we don't want to be impacted in our

10  ability to take these entities into bankruptcy.

11      And we think as -- you know, as Your Honor probably

12  knows under the case law, you have great discretion to set the

13  scope of the, you know, of the receivership order.  And so,

14  you know, in that order, we would, you know, we would like

15  something that, you know, doesn't prevent, you know,

16  management from -- you know, from taking the companies --

17  these defendant entities into Chapter 11.

18      THE COURT:  Well, if I appoint a receiver, that's

19  management.  You're not going to have a competing receiver and

20  an operator, as I understand it.  That's chaos.  The receiver

21  is, in effect, running the company under court supervision to

22  assure that the assets of the company and the -- in this case,

23  the patients and residents of these facilities are being

24  treated appropriately.

25      But I -- perhaps there's some limits I can place on a

1   receiver, but I've -- in the few cases I've had where I've

2   appointed a receiver to allow a receiver and to have another

3   person run -- competing or offering differing views or

4   disputing the authority of the receiver leads to chaos.  You

5   can educate me otherwise, if it -- something like that's done

6   in healthcare facilities, but I have always understood a

7   receiver to have ultimate control and to make decisions,

8   again, under court supervision, in the best interest of the

9   entities that the receiver is running.

10          I'm not sure what you're asking for where you want

11   their hands tied.  If the receiver thinks a bankruptcy -- if I

12   appoint a receiver and they think bankruptcy is the best

13   course to go, they have the authority to go to bankruptcy,

14   file -- file for bankruptcy, file for reorganization,

15   presumably, not liquidation.  And then a bankruptcy judge

16   would oversee the reorganization.

17          Whether the trustee or professionals appointed by the

18   trustee would be Mr. Flanagan or Mr. Campbell, if he's the

19   receiver here, it would be up to the bankruptcy judge, because

20   their -- their interest -- their sole interest is preserving

21   the assets of the estate, making sure that creditors get paid

22   in a -- in a fair way; and in a reorganization, making sure

23   the company comes out stronger at the end of it than it was

24   when it came in.  These are pretty fundamental principles, as

25   far as I know.  But I don't know that you can have two people

1    running a company; one under court authorization and one under

2    the old regime.

3          Tell me if I'm wrong, either side.

4          MR. AHMAD:  Yeah, and I was -- I was merely

5    suggesting a sentence that would just say, you know, the --

6    you know, again, the receiver has all the powers that you're

7    describing, you know, but nothing would prevent, you know, the

8    defendant entities from making the decision to be included in

9    a Chapter 11.  So some -- something -- something as simple as

10    that.

11          And I do think that, Your Honor, as I -- as I pointed

12    out on Monday, the way the bankruptcy code works -- right? --

13    is that once a filing is made -- right? -- then if there's

14    a -- if there's a receiver in place, that receiver then turns

15    over all the estate pros- -- property to the bank.  A

16    provision like that exists -- right? -- in part because there

17    are instances where, you know, there's a receiver overseeing

18    certain entities or, you know, or parts of thing that become

19    part of a bankruptcy.  And so that -- that's the way I was

20    envisioning, understanding Your Honor's point.  But -- and

21    obviously, principally, we object to the appointment of a

22    receiver to begin with --

23          THE COURT:  I understand.

24          MR. AHMAD:  -- but yeah.

25          THE COURT:  Okay.

1          MR. AHMAD:  Yeah.

2          THE COURT:  All right.  Anything else plaintiffs want

3  to say?

4          MS. TINKHAM:  Yes, Your Honor, I'd like to respond to

5  a few of those points, if I may?

6          THE COURT:  All right.  Go ahead.

7          MS. TINKHAM:  I'll start with the provision within a

8  receiver order to prohibit bankruptcy filing.  We certainly

9  object to that.  When the -- a receiver's appointed, we -- we

10  do want him to have full authority over these entities.  The

11  point here is to have an independent officer governing the

12  entities when appointed by the Court reporting to the Court.

13  So we do think it's in -- within Your Honor's authority to not

14  have a provision carving out a bankruptcy filing from the

15  order.

16          I also want to go back to the -- the sense of there's

17  not an emergency here.

18          THE COURT:  Hang on one second, because I have a

19  comment about that I want to make.

20          Are you -- you need to talk to your client for a

21  moment or are you okay?

22          MR. AHMAD:  No.  I apologize.

23          THE COURT:  All right.  There is an emergency.

24  There's been a major default.  There's a $20 million

25  emergency.  So I -- I don't think this was a premature motion,

1    and I so find.  There's a -- there's a major default.  That's

2    an emergency.  When your major creditor isn't getting paid and

3    they accelerate the loan, of course, that's an emergency, in

4    my mind.

5            Go ahead.

6            MS. TINKHAM:  Yes.  And -- and what I wanted to say

7    for the record in addition to that is just that, you know, we

8    know Mr. Campbell.  We have great respect for him.  We know

9    the Winston & Strawn attorneys.  We have great respect for

10   them.  And our clients have trusted them throughout this

11   process and given them the rope to get here.  But we are where

12   we are two months later, and it's the hand they've been dealt,

13   is that there isn't funding to continue these entities

14   forward, to get the insurance, to ensure that these entities

15   have proper food, pharma for the residents, and to just

16   maintain these facilities.

17           One of the statements made was liquidity is not a

18   factor.  Well, it is a factor, because when there isn't

19   liquidity, it's harming our collateral and it's harming the

20   residents.  It is a reason to have an appointment of a

21   receiver.

22           THE COURT:  Do you object to the suggestion by

23   Mr. Ahmad that Mr. Campbell be appointed receiver in this

24   case?

25           MS. TINKHAM:  As much respect and I know as -- as

1    knowledgeable and great Mr. Campbell is, we do object.  He's

2    not an -- can't be an independent officer here because he's

3    been employed as a consultant for the defendants.  He has, you

4    know, intimate workings with the defendant's management; he's

5    been employed by them; he has -- they are his client.  I don't

6    think that he can act here as an independent officer of the

7    court.

8            And I -- I do believe Mr. Flanagan is the appropriate

9    person here to be the receiver.  One, because he's been

10   appointed in the other cases.  But, two, he really is -- he

11   has 35 years of experience of running these types of

12   facilities.  He knows the state, he knows the -- how to run

13   them, and how to oversee the management.

14           There was also some talk of not trusting his

15   management company -- management company that was brought in

16   in the Rockford case is actually completely different than the

17   management company that they've proffered to bring in in this

18   case.  So I -- you know, those statements with respect to

19   Tutera I think are completely separate from this proceeding

20   here.

21           THE COURT:  All right.  Anything else?

22           MS. TINKHAM:  Yes, I just -- two quick points.  With

23   respect --

24           THE COURT:  Not too quick.  Slow down.  Okay.

25           MS. TINKHAM:  Number 1 --

1      THE COURT:  All right.

2      MS. TINKHAM:  -- with respect to the insurance, while

3  we've heard that it's bound, we -- we haven't received any

4  evidence.  All we received today was this preview statement

5  and -- and still no evidence of that.  I do trust Mr. Ahmad

6  and his statements, but we have not received any evidence of

7  it.  We heard that it will require 30 days to fund it.  We

8  don't know how much that's going to cost.  And while they

9  believe that they are going to obtain financing, we haven't

10  heard any concrete evidence of that coming anytime soon.

11      And we've heard statements that they're trying to get

12  advances from Medicaid for over a month now.  We've heard that

13  they're trying to get financing for bankruptcy for over a

14  month now.  So time is just running short to expect that

15  that's going to actually happen now.

16      And then the last point I did want to make was

17  with -- or I'm sorry -- two more points, but I'll make them

18  quick.

19      One was sufficient funds in the appounts -- in the

20  accounts to pay payroll.  When we did receive the information

21  from CIBC this week that the checks were bouncing within the

22  accounts of these defendants, that was a check for $37,000.

23  So if there wasn't money in there to pay $37,000, I don't know

24  how there's going to be enough money to pay payroll.  I don't

25  have evidence, but it -- it's important to keep in mind.

1          THE COURT:  Which account had the checks bouncing?

2          MS. TINKHAM:  Um, I'd have to ask my client if she

3    remembers the particular defendant, which -- which facility...

4      (Counsel conferring.)

5          THE COURT:  Well, we can't hear her because she's not

6    on the mic.  If you want to talk to her for a moment.  I don't

7    need the specific account number, but Mr. Campbell described a

8    couple of Medicaid accounts or -- where the money comes in --

9          MS. TINKHAM:  Uh-huh.

10         THE COURT:  -- and then a zero balance account which

11   they fund to pay their payroll.

12         I don't know if they have a similar account for

13   payment of incidental vendor expenses.  But what account had

14   no money in it where -- where there were checks drawn, where

15   there was insufficient funds to cover it?

16         If you want to talk to your client, go ahead.

17         MS. TINKHAM:  Okay.  Thank you.

18         THE COURT:  All right.

19     (Counsel conferring.)

20         MS. TINKHAM:  So, Your Honor, for --

21         THE COURT:  Go ahead.

22         MS. TINKHAM:  -- for the operators here, there's two

23   operators with respect to the defendants in this case.  Each

24   of them have their own collection accounts, as well as their

25   own operating accounts that collection accounts sweep into the

1  operating accounts on a daily basis.

2        THE COURT:  So two operators for the defendants in

3  this case?

4        MS. TINKHAM:  Yes.

5        THE COURT:  All right.

6        MS. TINKHAM:  We do not know which operator account

7  it was, but it was their operating account, which is the

8  account we exercised control over that was bouncing the

9  checks.  So that would be where -- all of the government

10  collections come in to a lower account, they get swept into

11  that operating account.  That operating account is what they

12  pay out of.  That's the account that was bouncing the checks

13  and didn't have sufficient funds.

14        THE COURT:  All right.  Do you have information about

15  that, Mr. Ahmad or Mr. Campbell?

16        MR. AHMAD:  If I could defer to Mr. Campbell.

17        MR. CAMPBELL:  Yeah, I'm happy to ans- -- answer

18  that.

19        THE COURT:  Make sure the mic's closer.  Just pull it

20  in.

21        MR. CAMPBELL:  I'm sorry.  I'm happy -- I'm happy to

22  answer that.

23        They have to be manual sweeps.  Paige referred to

24  automatic, and they are not automatic.  So what happens is

25  that one of the cash management or treasury people at -- at

1    the company will look at those accounts.  They will determine

2    what needs to be moved to the operating accounts and

3    physically move dollars.  It is not automatic.

4            Secondly, when the account control agreements were --

5    were triggered a few days ago, we no longer had access to move

6    that -- move those dollars.  So we were prevented from moving

7    dollars to cover those checks.  So, essentially, by triggering

8    the account control, it was a guarantee that we were going to

9    bounce those checks because we no longer had the ability to

10   move funds.

11           THE COURT:  They hadn't -- had they bounced before

12   they exercised the -- the control mechanism?

13           MR. CAMPBELL:  Not that I am aware of.

14           THE COURT:  Do you know otherwise?

15           MS. TINKHAM:  No, I don't, Your Honor, because we

16   don't have the bank account information.

17           THE COURT:  I thought you did.  I thought you were

18   able to get access to this because you were on the account.

19           MS. TINKHAM:  No.  This was only what CIBC relayed to

20   us on the phone, all of this information.  They had not given

21   us any of the actual documentation yet.

22           THE COURT:  So you don't know whether the bouncing

23   occurred before you exercised your control -- well, wouldn't

24   it have had to?

25           MS. TINKHAM:  Well, it was after.  The -- the

1    potential to bounce was after because the phone call was made

2    to us yesterday.

3           THE COURT:  I see.  Okay.  All right.  So the -- the

4    bouncing may have been a consequence of your exercising

5    control over the account, not a -- necessarily a lack of

6    funds?

7           MS. TINKHAM:  Yes.  And because we don't have the

8    information, we don't know if there are other funds or not.

9           THE COURT:  Okay.  All right.  Anything else?

10           MS. TINKHAM:  And just going back to the information,

11    I'll end with this, Your Honor, is that, you know, I -- I

12    appreciate that defense counsel has indicated they're working

13    to provide it to us, but this is information -- and Mr. Hope

14    from BYS is here and can testify to it -- that he was given

15    within minutes, and it's been since January 30th and we still

16    don't have it.  So it's -- it's -- it is something that is

17    easily provided, and it just has not been provided.

18           THE COURT:  And it was given to him within minutes

19    in, what, the Rockford case?

20           MS. TINKHAM:  Yes.

21           THE COURT:  Okay.

22           MS. TINKHAM:  And not pursuant to a court order.  It

23    was, he went for that lender.  He said, I'm the lender's

24    consultant.  I need X, Y, and Z information, and they provided

25    it to him before the entry of the receiver order.

1      THE COURT:  Okay.  All right.  Anything else by

2  either side?

3      MR. AHMAD:  Yeah, the only thing just on that was

4  when he received that information, it wasn't like he emailed

5  one day and it was like, here's a ZIP file with the

6  information.  He was in town, you know, on premise get -- you

7  know, getting all that information.  So again, it's a little

8  bit of an overcharacterization of the -- you know, of the --

9  again, we are working on providing that information into all

10  creditors --

11      MS. TINKHAM:  Your -- your --

12      MR. AHMAD:  -- for that matter.

13      MS. TINKHAM:  Your Honor, it's not paper information.

14  They gave him access to pull the information electronically.

15  They can do that anywhere.

16      THE COURT:  Okay.  All right.  Well, does either side

17  see the need for an evidentiary hearing to be held?  The

18  petition was supported by affidavit.  So is there anybody that

19  need -- feels the need to call a witness under oath and have

20  them -- him or her testify about any of the assertions made by

21  counsel?

22      First, from plaintiff?

23      MS. TINKHAM:  No, Your Honor, we don't feel the need

24  to call -- call witnesses, unless they need to be examined by

25  defense counsel.

1          THE COURT:  And Counsel?

2          MR. AHMAD:  Neither do we, Your Honor.

3          THE COURT:  Okay.  All right.  Well, I'm going to

4   grant the motion.  I -- this motion for appointment of

5   receiver.  The -- not the only reason, but the primary

6   reason -- certainly, the one that carries the significant

7   amount of weight in my mind is the default of the defendants

8   on the nearly $20 million in loans, and the fact that when

9   they got those loans, they agreed as a condition of receiving

10  that money that the secured party, plaintiff here, is entitled

11  to appointment of a receiver upon the occurrence of an event

12  of default.  There's been a concession; there's been an event

13  of default, of course, which is not surprising.  It's

14  happened, and no reason to contest it.  And on the record,

15  there's been a concession that has occurred.  That puts into

16  operation Section 2(d) of the assignment of rents and leases,

17  and so that is a key factor in my determination that a

18  receiver should be appointed.

19          Secondly, the fact that insurance has been obtained,

20  there's no indication it's been paid for.  I raised a number

21  of questions about whether or not -- you know, what the scope

22  of that insurance is that plaintiffs had argued that they

23  should be on the insurance.  They're not.

24          I appreciate that defendants have gotten a -- found a

25  vendor -- or an insurance company to insure them, but whether

1    it's going to be paid for, whether it's going to have the

2    proper parties listed on it, is -- is unknown at this point.

3    Financing for that insurance policy is unknown at this point.

4    Having Medicaid payments accelerated at this point is not a

5    done deal, or by any means something that can be guaranteed.

6    All of these indicate a huge potential for a lack of

7    liquidity.  You owe $20 million.  There is no liquidity.

8         Now, it's possible, I suppose, that in -- and I'm

9    hopeful that the receiver can manage these companies so they

10   can be reorganized, employees can be paid.  Because if

11   employees don't get paid, residents suffer.  That's a given in

12   a medical facility, an elderly care facility, or any type of

13   health facility, people are there because they need help.  If

14   the workers aren't getting paid, they're not going to work.

15   And when they don't work, patient health suffers,

16   significantly.  So I think that is a paramount concern to any

17   receiver, and they have to make sure that occurs.

18        And, therefore -- and I think given the -- what is a

19   crushing debt that is currently owed by defendants, a receiver

20   is necessary to preserve the assets that are there, to make

21   sure that the patient health does not suffer because of any

22   missed payments to employees.

23        And for all those reasons, I think a receiver ought

24   to be appointed.

25        I don't know Mr. Campbell, I haven't read a résumé of

1    his, he seems impressive based on his testimony today, and

2    also, plaintiffs have conceded he's an impressive person

3    relating to the type of expertise that's needed to serve as

4    receiver over healthcare facilities, but I see that -- I've

5    read Mr. Flanagan's résumé, Judge Johnston saw fit to appoint

6    him, and I think there is certainly efficiencies in having the

7    same receiver in both cases.

8         These defendants are related.  They're related

9    entities in many ways.  And Mr. Petersen apparently is --

10   oversees all of it, at least in some ownership capacity.  So

11   having two different receivers I think is inefficient and

12   would diminish the funds of the estate over which they are

13   receivers.

14        If that receiver decides he wants to -- Mr. Flanagan

15   decides that it's in the best interest of these entities to

16   declare bankruptcy or make a bankruptcy filing, he should have

17   that ability to do so without having another voice -- a voice

18   can tell him that's not a good idea, but a voice can't tell

19   him he can't do it, other than me, but not Mr. Petersen or

20   someone else.

21        So I'm going to give full authority of a receiver.

22   I'll look at the proposed order, but it should be consistent

23   with the order that Judge Johnston entered for him in the

24   Western Division.  And I will appoint Mr. Flanagan as

25   receiver.

1      I assume the receivership order has a provision about

2  reports to the Court.

3      MS. TINKHAM:  Yes, Your Honor.

4      THE COURT:  All right.  You should show the proposed

5  order to Mr. Ahmad.  If there's something that requires some

6  tweaking or some change -- you've seen the order in Rockford.

7  Is that correct?

8      MR. AHMAD:  Yes.  Yeah, it was Exhibit B to their

9  motion.

10      THE COURT:  Yeah.  Is there anything about that

11  order, other than the fact it was entered, that you have an

12  objection to?

13      MR. AHMAD:  Yeah, I'd want to read -- and obviously,

14  we -- we object to the -- to the appointment of a receiver --

15      THE COURT:  Of course.

16      MR. AHMAD:  -- but taking Your Honor's statement that

17  you want it to look the same as the -- the -- the Rockford

18  case --

19      THE COURT:  Unless there's a reason for it not to,

20  but I can't on what I've seen see a reason why they should be

21  inconsistent or even different, other than the entities.

22      MR. AHMAD:  Yeah, so maybe just send me the -- a Word

23  version, I'll look at it, and we -- we get it submitted, then.

24      Does that make sense?

25      THE COURT:  Yeah, I'd like Mr. Ahmad to see it,

1   but -- and if there are objections, you can raise them.  But

2   the objection shouldn't be to the appointment of a receiver

3   because that is noted and I've overruled that objection.

4   It -- if there's a particular facet of that proposed order

5   that doesn't make sense in the context of these entities, you

6   can explain why.

7          I'm out of the -- I'm not in chambers tomorrow, but

8   I'm accessible, but then I'm inaccessible for two weeks.  So

9   if there's a -- I prefer you do this quickly so I can rule on

10  it.  If not, you'll have to go to the emergency judge.  Or

11  possibly we could designate Judge Johnston as the emergency

12  judge to hear this.

13         I did talk to Judge Johnston about whether there were

14  any efficiencies in consolidating these cases, not for trial,

15  but for purposes of supervision so that reports of

16  Mr. Flanagan would go to a single judge and -- is there

17  anything about the way these are structured, given the overall

18  ownership of them -- and you're the plaintiff in that case

19  too.  Is that correct?

20         MS. TINKHAM:  Yes, Your Honor.

21         THE COURT:  Is there --

22         MS. TINKHAM:  It's a different entity.  We -- we are

23  counsel to the plaintiff in that case.

24         THE COURT:  Okay.  Is it a different lending entity?

25         MS. TINKHAM:  Yes, Your Honor.

```
 1              THE COURT:  All right.  But the oversight is going to
 2    be similar.  And the question is:  Is there any reason not to
 3    have -- if we can find a way in the local rules to do it, is
 4    there a reason not to have a single judge, which would likely
 5    be Judge Johnston, because that was the earlier filed case,
 6    but is there a reason not to have a single judge overseeing
 7    the activities of the receiver?
 8              If --
 9              MS. TINKHAM:  No, we think that's fine.
10              MR. OTTAVIANO:  We were trying to find a provision
11    that actually consolidated them together, but we -- we just
12    couldn't.
13              THE COURT:  Well, it may -- and it may be it can't
14    be, but I think by agreement judges can agree to transfer
15    cases for efficiencies and for the good of the litigation.
16    And if Judge Johnston agrees to take it, he can oversee it.
17    It may when there's a trial, if there is a trial, they are --
18    remain -- it'll still remain before me, but it may be that the
19    supervision of the case while it's ongoing will be with
20    Judge Johnston.  But I'll talk to him and see if there's a
21    mechanism that we can get through the Executive Committee to
22    allow that to happen.
23              How about -- you had no objection.  What about
24    defendant?
25              MR. AHMAD:  Yeah, I think -- yeah, and I'm not aware
```

1   of a rule that would permit it either.  I'd have to talk to

2   the client.  I have no -- I haven't thought about it yet, so I

3   don't have a --

4           THE COURT:  More of a question of, if there's a rule

5   that allows it, do you have an objection to it?

6           MR. AHMAD:  We may.  Yeah, we may.

7           THE COURT:  All right.  That's fine.

8           MR. AHMAD:  Yeah.

9           THE COURT:  If we propose to do that, we'll give the

10  parties a chance to comment on any -- any proposal we have,

11  which is fine.  I take no offense, so -- nor does

12  Judge Johnston.  But we just thought there's a synergy and

13  efficiency in having the same receiver.  There may be a

14  similar -- not a cost efficiency, because we don't cost you

15  anything, but there is a -- possibly an efficiency in having

16  the same judge look at the reports from -- for both groups of

17  entities to make sure there's not something going on in one

18  that's not going on in the other.

19          You've already indicated that you were not

20  comfortable sharing the reports of what the receiver has

21  learned in those cases, understandably.  But if a single judge

22  is authorized by the parties to look at it, it may -- I can

23  see some reasons that's a good idea.  That's all.

24          MS. TINKHAM:  Understood.

25          THE COURT:  But I'll give you a chance to object if

1    that's something that Judge Johnston and I can work out.

2          MR. AHMAD:  Thank you, Your Honor.

3          MS. TINKHAM:  Your Honor, with respect to the order,

4    if I can circle back that?

5          THE COURT:  Yes.

6          MS. TINKHAM:  It is extremely important for us to

7    have the order right away so that Mr. Flanagan can show it to

8    the State.  He can go in and he can start his processes.  I

9    propose, since we have ended earlier here today, that we sit

10   here and do it now.  We have paper copies.  I'd like any

11   comments, and that way we can get it to Your Honor to -- to

12   enter.

13         THE COURT:  I think that's a good idea.  Your

14   client's here; you're here.  Work on any changes if there are

15   going to be -- that you need to make.  Again, I'm -- if

16   there's a disagreement, I'm back in chambers.  You can call me

17   out, and I'll simply rule on your disagreements.  But

18   hopefully, you can work those out because these -- the order

19   shouldn't be a huge surprise to your overall client because

20   he's already seen the one in Rockford.

21         So anything else we need to put on the record?

22         MR. OTTAVIANO:  No.  Thank you, Your Honor.

23         MS. TINKHAM:  Thank you, Your Honor.

24         THE COURT:  All right.  I'll be available to enter

25   that order.  My courtroom deputy is here until 4:30.  If you

1  can work it out before then and I enter it -- and -- and

2  there's either agreement or I can rule on the disagreements,

3  hopefully, there are none, I'll enter the order, and it'll be

4  on the docket today.

5          MR. AHMAD:  Thank you, Your Honor.

6          MS. TINKHAM:  Thank you.

7          THE COURT:  Thank you.

8      (Proceedings concluded at 2:11 p.m.)

9                        CERTIFICATE

10     I certify that the foregoing is a correct transcript from

11  the record of proceedings in the above-entitled matter.

12  */s/ Elia E. Carrión*          *30th day of April, 2024*

13  _____        _____
*Elia E. Carrión*                        *Date*
*Official Court Reporter*

14

15

16

17

18

19

20

21

22

23

24

25